# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
October 5, 2012 Session Heard at Tennessee Wesleyan College[1]

## BRANDON MOBLEY v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 89072      Bob R. McGee, Judge**

---

**No. E2010-00379-SC-R11-PC - Filed February 21, 2013**

---

This appeal involves a petition for post-conviction relief based on multiple ineffective assistance of counsel claims. The petitioner was convicted in the Criminal Court for Knox County of two counts of premeditated first degree murder, one count of especially aggravated robbery, and one count of setting fire to personal property. His convictions were affirmed and his sentences were modified on direct appeal. *State v. Mobley*, No. E2006-00469-CCA-R3-CD, 2007 WL 1670195 (Tenn. Crim. App. June 11, 2007), *perm. app. denied* (Tenn. Sept. 24, 2007). Thereafter, the petitioner filed a petition for post-conviction relief based on numerous instances of his trial counsel's alleged ineffective assistance and on several instances of alleged trial court errors. Following a two-day hearing, the post-conviction court dismissed the petition. On appeal, the Court of Criminal Appeals reversed the petitioner's convictions and remanded the case for a new trial after determining that the petitioner's trial counsel had been ineffective with regard to limitations placed on the ability of a defense expert to testify that the petitioner's mental condition rendered him unable to premeditate. *Mobley v. State*, No. E2010-00379-CCA-R3-PC, 2011 WL 3652535 (Tenn. Crim. App. Aug. 18, 2011). We granted the State's Tenn. R. App. P. 11 application for permission to appeal. We have determined that the petitioner is not entitled to post-conviction relief based on the manner in which his trial counsel dealt with the limitations placed on the defense's expert witness. However, we have also determined that the record does not permit the reviewing courts to determine whether the performance of the petitioner's trial counsel was deficient with regard to the requirement that the petitioner wear a stun belt during the trial. Accordingly, we affirm the judgments of the lower courts denying post-conviction relief based on the alleged errors of the trial court and on all the ineffective assistance of counsel claims except the claims based on the testimony of the defense's mental health expert and the use of the stun belt during the trial. We reverse the judgment of the Court of Criminal Appeals and affirm the judgment of the post-conviction court with regard to the ineffective

---

[1]Oral argument was presented on the campus of Tennessee Wesleyan College, Athens, Tennessee, as part of the Supreme Court Advancing Legal Education for Students (S.C.A.L.E.S.) project.

assistance of counsel claim based on trial counsel's failure to elicit a specific opinion from the defense's mental health expert. We also reverse the judgment of the lower courts denying the ineffective assistance of counsel claim relating to trial counsel's failure to object to the use of a stun belt during the trial and remand that issue alone to the post-conviction court for a new hearing.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed in Part; Reversed in Part; and Remanded**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Leslie E. Price, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellant, State of Tennessee.

Wade V. Davies, Knoxville, Tennessee, for the appellee, Brandon Mobley.

**OPINION**

**I.**

Brandon Mobley was sixteen years old on May 26, 2003, when he shot and killed Joshua Nance, his drug supplier, and Oshalique Hoffman, Mr. Nance's girlfriend. Two weeks earlier, Mr. Mobley, who "sold a substantial amount of drugs to help [his] family," had obtained $2,000 worth of cocaine from Mr. Nance with the promise that he would pay Mr. Nance in "about a week." On the day of the shooting, Mr. Mobley had sold only $400 worth of the cocaine and was concerned that Mr. Nance was expecting him to pay $2,000 for the cocaine Mr. Nance had provided him.

Mr. Mobley was carrying a pistol on the day of the shooting.[2] He met Mr. Nance and Ms. Hoffman in a parking lot several minutes away from Mr. Mobley's home. Ms. Hoffman had driven her car to the parking lot and was sitting in the driver's seat. Mr. Nance was sitting in the front passenger's seat, and Mr. Mobley was sitting in the rear seat on the passenger's side. Mr. Mobley fired one shot from extremely close range into the left side of Mr. Nance's head and fired one shot into the back of Ms. Hoffman's head. After pushing Ms. Hoffman's body out of the automobile, Mr. Mobley drove away from the parking lot in

---

[2]Mr. Mobley testified at trial that he had been regularly carrying a pistol for two weeks prior to the shooting because he had been robbed.

Ms. Hoffman's automobile with Mr. Nance's body still in the front seat. He drove to a nearby church and disposed of Mr. Nance's body in a wooded area by pushing it down a hill.[3]

Residents near the parking lot observed Mr. Mobley driving away in Ms. Hoffman's automobile. They summoned the authorities after they discovered Ms. Hoffman's body in the parking lot. Near Ms. Hoffman's body, the authorities found a six-shot revolver, identified at trial as belonging to Mr. Mobley, with two spent cartridges and four bullets. Mr. Mobley's fingerprint and Ms. Hoffman's blood were on the revolver.[4]

Later the same day, Mr. Mobley drove Ms. Hoffman's automobile to an acquaintance's home and asked for a bowl of water and towels to clean the automobile's interior. Later, he asked three other acquaintances to follow him as he drove the automobile to an isolated gravel road where he set the automobile on fire. The authorities discovered the burning automobile approximately two hours after being summoned to the scene of the shooting.

When Mr. Mobley returned from the burning car, one of his friends noticed that there were blood spots on Mr. Mobley's clothing and shoes and that Mr. Mobley had a great deal of money. While his friends drove him to a motel, Mr. Mobley told them that he had killed Ms. Hoffman and Mr. Nance after Mr. Nance threatened him.[5] He also told them that "he'd rather have 12 judging him than six carrying him." The authorities received a tip that Mr. Mobley was at the motel and arrested him a short distance from the motel as he was trying to escape.

A Knox County grand jury indicted Mr. Mobley with two counts of both premeditated and felony first degree murder for the deaths of Ms. Hoffman and Mr. Nance, one count of especially aggravated robbery of Ms. Hoffman, and one count of setting fire to personal property for the burning of Ms. Hoffman's automobile. The State also gave notice that it intended to seek life sentences without parole.

Mr. Mobley's trial lasted from May 2 through May 6, 2005. His defense at trial was that he had shot Mr. Nance and Ms. Hoffman in self-defense and that the killings had not

---

[3]The authorities did not find Mr. Nance's body until the early morning hours of May 27, 2003.

[4]Ballistics tests later confirmed that the shots that killed Ms. Hoffman and Mr. Nance were fired by Mr. Mobley's revolver.

[5]Mr. Mobley gave conflicting accounts to various individuals he encountered on the day of the shooting. He told his friends that he had shot Mr. Nance and Ms. Hoffman when Mr. Nance threatened him as he was attempting to purchase drugs. He told another individual that he needed to clean the car because he had been involved in a wreck, He told yet another individual that he had not done anything.

been premeditated. The State objected to the testimony of Dr. Pamela Auble, the defense's clinical psychologist, particularly her opinion that "because of . . . mental illnesses, Mr. Mobley would have been unable to premeditate at the time of the killings." The trial court initially sustained the State's objection and excluded Dr. Auble's testimony in its entirety.

After the trial court excluded Dr. Auble's testimony, Mr. Mobley himself took the stand. He testified that he knew that Mr. Nance was in the habit of going armed and that Mr. Nance threatened to kill him if he did not pay for the cocaine. Mr. Mobley also testified that he shot Mr. Nance after Mr. Nance laid a gun on the front seat. In addition, he stated that he shot Ms. Hoffman because he thought that she was reaching for a weapon.[6]

Following Mr. Mobley's testimony, the State withdrew its objection to most of Dr. Auble's testimony. The trial court determined that the defense could call Dr. Auble but also that she could not testify that Mr. Mobley's mental illnesses prevented him from being able to "premeditate at the time of the killings." Accordingly, Dr. Auble took the stand and testified that she had diagnosed Mr. Mobley with recurrent major depression, attention deficit hyperactivity disorder, and oppositional defiant disorder. She also testified that because of these conditions, Mr. Mobley "tends to act without thinking" and "tends to respond first and then think about what he did later." With specific reference to the shooting, Dr. Auble opined that Mr. Mobley responded "quickly," "impulsively," and "without thinking through what he was doing." During the State's cross-examination, Dr. Auble conceded that her opinion depended to some degree on the veracity of the information that Mr. Mobley had provided her.

The jury found Mr. Mobley guilty of two counts of premeditated first degree murder, one count of especially aggravated robbery, and one count of setting fire to personal property. The trial court sentenced Mr. Mobley to two consecutive life sentences[7] plus twenty-two years. On appeal, the Court of Criminal Appeals affirmed the convictions and the sentences for premeditated first degree murder. However, the Court of Criminal Appeals modified the sentences for the remaining convictions from twenty-two years to nineteen years. *State v. Mobley*, No. E2006-00469-CCA-R3-CD, 2007 WL 1670195, at *17 (Tenn. Crim. App. June 11, 2007), *perm. app. denied* (Tenn. Sept. 24, 2007). The Court of Criminal Appeals also determined that the trial court had erred by initially excluding Dr. Auble's testimony but held that this error was harmless because Dr. Auble was eventually permitted to testify. *State v. Mobley*, 2007 WL 1670195, at *14.

---

[6]This version of the events differs from those Mr. Mobley related to the various individuals he encountered on the day of the shooting.

[7]After the jury returned its verdict, the State withdrew its notice that it intended to seek life sentences without parole.

On April 24, 2008, Mr. Mobley filed a timely pro se petition for post-conviction relief in the Criminal Court for Knox County. The judge who was assigned to hear Mr. Mobley's case was not the same judge who had presided over Mr. Mobley's trial. In his petition, Mr. Mobley asserted that he had received ineffective assistance of counsel at trial and on appeal in twenty-four particulars. He also asserted three instances of prosecutorial misconduct and eleven errors on the part of the trial court, and he contended that the cumulative effect of these errors violated his constitutional rights. The post-conviction court appointed counsel for Mr. Mobley. On November 20, 2008, Mr. Mobley's counsel filed an amended petition supplementing rather than narrowing the grounds upon which post-conviction relief was being sought.

Following an evidentiary hearing on November 25 and December 16, 2009, the post-conviction court filed an order on January 28, 2010, denying Mr. Mobley's petition for post-conviction relief. Mr. Mobley appealed to the Court of Criminal Appeals.[8] In an opinion handed down on August 18, 2011, the majority of the members of the panel determined that Mr. Mobley was entitled to post-judgment relief on only one of the grounds he had raised. The majority determined that counsel's performance had been deficient with regard to the trial court's ruling that Dr. Auble could not be asked whether Mr. Mobley lacked the capacity to premeditate. Specifically, the court held that "the errors of counsel in arguing the issue at both the trial court and appellate court levels, in conjunction with trial counsel's failure to inquire or even understand his duty to inquire about [Mr. Mobley's] ability to premeditate, amounted to deficient performance" and that "there is a reasonable probability that had trial counsel not committed these errors, the result of the proceeding would have been different." *Mobley v. State*, No. E2010-00379-CCA-R3-PC, 2011 WL 3652535, at *12 (Tenn. Crim. App. Aug. 18, 2011).

The third member of the panel dissented from the majority's conclusion that trial counsel's performance was deficient relating to Dr. Auble's testimony. The dissenting judge agreed with his colleagues that the trial court had improperly barred Dr. Auble's testimony and noted that "[i]t certainly would have been better if the trial court had not erred and had allowed trial counsel to ask the direct question of whether [Mr. Mobley] had the mental

---

[8]On this appeal, Mr. Mobley asserted the following seven grounds for granting him post-judgment relief: (1) the complete breakdown of the attorney-client relationship, resulting in ineffective assistance of counsel in a number of respects; (2) trial counsel's failure to object to and the trial court's failure to conduct a hearing on placing Mr. Mobley in a shock belt during the trial; (3) trial counsel's failure to request and the trial court's failure to conduct a proper *Momon* hearing before Mr. Mobley took the stand; (4) the State's failure to disclose that it had told a reluctant State's witness that her younger sister could be charged as an accessory after the fact because she helped Mr. Mobley clean the interior of Ms. Hoffman's automobile after the shooting; (5) the constitutionality of the procedure used in the juvenile court to transfer Mr. Mobley to criminal court to be tried as an adult; (6) the destruction of jail visitation logs; and (7) the cumulative prejudicial effect of all the errors.

capacity to premeditate the murders for which he was on trial." *Mobley v. State*, 2011 WL 3652535, at \*21 (Smith, J., dissenting in part). However, in light of the evidence of premeditation presented by the State and the substance of Dr. Auble's eventual testimony, the dissenting judge concluded that Mr. Mobley had failed to meet "the high burden of showing a 'reasonable probability' of a different result." *Mobley v. State*, 2011 WL 3652535, at \*22 (Smith, J., dissenting in part) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

## II.

The Sixth Amendment to the United States Constitution provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." Similarly, Article I, Section 9 of the Constitution of Tennessee provides "[t]hat in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel." These provisions guarantee criminal defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. at 686; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of the right to the effective assistance of counsel presents a cognizable claim under the Post-Conviction Procedure Act.[9] *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008).

Tenn. Code Ann. § 40-30-103 states that relief "shall be granted when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Petitioners seeking post-conviction relief must prove their factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *see also Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011).

Claims for post-conviction relief based on alleged ineffective assistance of counsel present mixed questions of law and fact. *Calvert v. State*, 342 S.W.3d at 485 (citing *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009); *State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001)). The factual findings of a post-conviction court are conclusive on appeal, unless the evidence in the record preponderates against them. *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009); *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006). Accordingly, we generally defer to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). However, we review de novo a post-conviction court's application of the law to its factual findings and accord no presumption of correctness to the court's conclusions of law. *Grindstaff v. State*, 297 S.W.3d

---

[9]*See* Tenn. Code Ann. §§ 40-30-101 to -122 (2012).

at 216; *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007); *Vaughn v. State*, 202 S.W.3d at 115.

Counsel's representation becomes ineffective when it "so undermine[s] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. at 686. To prevail on a claim of ineffective assistance of counsel, a petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. at 687; *Pylant v. State*, 263 S.W.3d at 868. Failure to establish either deficient performance or prejudice necessarily precludes post-conviction relief. *Strickland v. Washington*, 466 U.S. at 697; *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004). Because a petitioner must establish both deficient performance and prejudice, a reviewing court need not address both prongs if the petitioner fails to demonstrate either prong. *Strickland v. Washington*, 466 U.S. at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

Establishing deficient performance requires a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. at 687; *see also Vaughn v. State*, 202 S.W.3d at 116. Counsel's performance is not deficient if the advice given or the services rendered "are within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d at 936. In other words, a petitioner must show that counsel's representation fell below an objective standard of "reasonableness under prevailing professional norms." *Strickland v. Washington*, 466 U.S. at 688; *Vaughn v. State*, 202 S.W.3d at 116.

Reviewing courts must take care to avoid measuring counsel's performance through "20-20 hindsight." *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)); *Goad v. State*, 938 S.W.2d at 369. To that end, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. at 689; *Goad v. State*, 938 S.W.2d at 369. Courts "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *State v. Honeycutt*, 54 S.W.3d at 767 (quoting *Strickland v. Washington*, 466 U.S. at 689). As the United States Supreme Court has emphasized, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland v. Washington*, 466 U.S. at 689. The fact that a particular strategy or tactical decision failed or adversely affected the defense does not, in and of itself, establish that the performance was deficient. *Goad v. State*, 938 S.W.2d at 369.

To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694; *see also Vaughn v. State*, 202 S.W.3d 116; *Goad v. State*, 938 S.W.2d at 370. In other words, a petitioner must establish that "counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Pylant v. State*, 263 S.W.3d at 869. We further note that a reasonable probability of being found guilty of a lesser charge satisfies the prejudice prong. *Pylant v. State*, 263 S.W.3d at 869.

## III.

One of the principal issues in this case – the one that divided the panel of the Court of Criminal Appeals – is whether Mr. Mobley's trial counsel's representation was prejudicially deficient because he failed to ask Dr. Auble directly whether Mr. Mobley lacked the capacity to premeditate. Addressing this issue requires a detailed understanding of what occurred at trial with regard to Dr. Auble's testimony.

### A.

Prior to trial, Mr. Mobley's trial counsel filed a Tenn. R. Crim. P. 12.2(b) notice that he intended to offer expert testimony regarding Mr. Mobley's mental state. At trial, following the close of the State's case-in-chief, defense counsel called Dr. Auble as a witness. The State immediately objected to calling Dr. Auble. Singling out the final sentence in her report that stated, "[I]t is my opinion that because of his mental illnesses, Mr. Mobley would have been unable to premeditate the crime of murder at the time of the shooting," the State insisted that this conclusion "is inadmissible testimony that . . . would invade the province of this jury."

Mr. Mobley's counsel responded that "we would be offering the testimony of Dr. Auble in order to testify . . . as to a mental disease or defect, which she has found in her report, as to his mental state at the time this happened." He also stated:

> I don't intend to ask her about whether or not she has an opinion
> as to whether or not Mr. Mobley could have premeditated . . .
> these acts. But I think I am entitled, under all the cases, that a
> qualified forensic psychologist can testify about his mental
> condition and her conditional psychiatric diagnosis that she's
> found to his mental state at the time . . . .

In addition, he pointed out to the trial court that *State v. Coulter*, 67 S.W.3d 3 (Tenn. Crim. App. 2001) holds "that a defendant may introduce expert testimony concerning the impact

-8-

of any mental disease or defect upon his capacity to form the requisite mental state required of first-degree murder . . . ."

The principal thrust of the State's argument was: "what's happening here is that we're trying to set up diminished capacity. As the Court well knows, that's been outlawed in this state . . . ." In response, Mr. Mobley's counsel continued to insist that Dr. Auble was

> entitled to testify, having examined this defendant, that he's suffering from a mental disease or defect in the form of acute depression, among other things, as to what his mental state was at the time this happened and how he would have reacted to perceived threats which have already come into evidence.

During the course of his argument, Mr. Mobley's counsel twice repeated that he did not intend to ask Dr. Auble's opinion on the "ultimate issue" of whether Mr. Mobley was incapable of premeditation.

Both parties cited cases in support of their arguments. Mr. Mobley's counsel maintained that the State's reading of the applicable cases was incorrect, stating that "[a]ll those cases say that a qualified expert can testify about the mental state" and that "evidence that tends to prove or disprove a required mental state . . . is relevant." He even attempted to directly rebut the State's argument that Dr. Auble's testimony was inadmissible as "diminished capacity" by insisting that "[d]iminished capacity is a defense for which a psychologist may testify and explain to negate the requisite mental state" under *State v. Perry*, 13 S.W.3d 724, 733-34 (Tenn. Crim. App. 1999) (stating that "diminished capacity," while not codified, is recognized and consists of the presentation of expert proof aimed at negating a requisite culpable mental state).

The trial court eventually sided with the State. After the prosecutor argued that it was the "exclusive [province] of the jury . . . to determine premeditation," the trial court responded, "I believe you're right, General." With that statement, the trial court concluded the discussion by ruling, "Well, we may see this again, but I'll hold the testimony to be . . . invasive and not allowable."

After the trial court excluded Dr. Auble's testimony, Mr. Mobley took the stand in his own defense. Following Mr. Mobley's testimony, his trial counsel requested the trial court to permit him to make an offer of proof regarding Dr. Auble's testimony. The trial court responded, "Not right now, no" and then excused the jury for lunch. After the jury left the courtroom, the trial court asked the State whether the parties disagreed about what the substance of Dr. Auble's testimony would be. This question prompted the following exchange between the trial court and the prosecutor:

Mr. Nichols: I – Judge, you know, the comment of the Court a little while ago has caused me to think, deferring to your wisdom. You said you were going to sustain my objection to [Dr. Auble's] testimony, but it worried the Court that you might be cutting off a defense. And I think you said we may – you may see it again.

The Court: We may see it again.

Mr. Nichols: And that's – and I could tell the Court was looking directly at the Attorney General when you suggested that we can see it again, and so with that, Judge, I would withdraw my objections to Dr. Auble's testimony.

The Court: All right.

Following the lunch recess, the trial court returned to the question of Dr. Auble's testimony outside of the presence of the jury. The court inquired regarding the extent of the State's waiver of its objection to Dr. Auble's testimony. The prosecutor responded that the State continued to object to questions on "the ultimate issue" of whether Mr. Mobley was capable of forming premeditation but that it withdrew its objection to the balance of Dr. Auble's testimony. The trial court responded, "All right. Is the doctor here?" Mr. Mobley's counsel took no part in this exchange and, immediately thereafter, called Dr. Auble to the stand.

**B.**

On direct appeal, the Court of Criminal Appeals found that the trial court had erred by initially excluding Dr. Auble's testimony but that this error was harmless because the trial court later permitted Mr. Mobley to call Dr. Auble as a witness. *State v. Mobley*, 2007 WL 1670195, at *13-14. In his post-conviction petition, Mr. Mobley asserted that his trial counsel had been ineffective because he had failed to articulate a sufficient basis for admitting Dr. Auble's testimony and, in the end, failed to secure admission of Dr. Auble's "ultimate issue" testimony. Following the post-conviction hearing, he changed his focus somewhat and argued that his trial counsel had been ineffective by not attempting to elicit Dr. Auble's opinion regarding his ability to premeditate because the trial court never instructed him not to ask that question after the State withdrew its objection to Dr. Auble's testimony.

The post-conviction court rejected Mr. Mobley's argument that his trial counsel was ineffective with regard to Dr. Auble's testimony. The court found that Mr. Mobley's counsel

had attempted to persuade the trial court that Dr. Auble's testimony was admissible, but that the trial court had rejected the argument. Accordingly, the post-conviction court attributed the exclusion of Dr. Auble's testimony to the trial court rather than to Mr. Mobley's counsel.

The Court of Criminal Appeals reversed the post-conviction court on this issue. It focused on counsel's (1) sitting silently and raising no objection when, after the State withdrew its objection, the trial court ruled that Dr. Auble could not be asked whether Mr. Mobley had the capacity to premeditate and (2) failing to understand his duty to inquire about Mr. Mobley's capacity to premeditate. The Court of Criminal Appeals concluded that the performance of Mr. Mobley's counsel was deficient and that there was a reasonable probability of a different result had he represented Mr. Mobley effectively. *Mobley v. State*, 2011 WL 3652535, at *12. The State now urges this Court to conclude that the Court of Criminal Appeals was in error.

## C.

We are constrained to observe at the outset that the record does not support Mr. Mobley's contention that, after the State withdrew its objection to calling Dr. Auble, his trial counsel was free to ask Dr. Auble's opinion on the "ultimate question" of whether Mr. Mobley had the capacity to premeditate. The Court of Criminal Appeals concluded, based on its reading of the record, that the trial court would not allow the inquiry even after the State withdrew its objection. *Mobley v. State*, 2011 WL 3652535, at *11-12 (observing that Mr. Mobley's counsel sat silently as the trial court ruled that Dr. Auble could not be asked whether Mr. Mobley could premeditate). We agree with that assessment.

The record reveals that the State's initial objection to Dr. Auble's testimony included a focus on Dr. Auble's opinion that Mr. Mobley was unable to premeditate at the time of the shooting. When the State withdrew its objection to Dr. Auble's testimony, it did so in conjunction with asking the trial court to instruct Mr. Mobley's counsel not to inquire about the "ultimate question" of whether Mr. Mobley could form premeditation. The trial court immediately responded, "All right." This conversation did not occur in a vacuum. In light of the State's initial objection to the "ultimate question" testimony, the trial court's initial decision to exclude Dr. Auble's testimony, and the State's later preservation of its objection to the "ultimate question" testimony, we can only conclude that the record does not clearly and convincingly establish Mr. Mobley's allegation that his trial counsel was free to ask Dr. Auble whether Mr. Mobley had the capacity to premeditate.

## D.

We turn first to the first prong of the *Strickland v. Washington* analysis – whether the performance of Mr. Mobley's trial counsel was deficient with regard to his examination of

Dr. Auble. Our analysis of the effectiveness of Mr. Mobley's trial counsel regarding this matter properly begins with a candid observation. Based on this record, there is cause to question whether any of the lawyers in the courtroom that day – Mr. Mobley's counsel, the prosecutors, or even the trial court[10] – had a firm grasp on the legal principles relating to the admissibility of Dr. Auble's testimony regarding Mr. Mobley's capacity to form the premeditation required to be convicted of premeditated first degree murder. Notwithstanding the general confusion of all attorneys present, the performance of Mr. Mobley's trial counsel was deficient.

The case relied upon by the District Attorney General in his opposition to Dr. Auble's testimony does not stand for the proposition that an expert witness cannot give an opinion regarding whether a defendant is capable of forming the requisite culpable intent to have committed the offense for which he or she is on trial. To the contrary, *Meeks v. State*, No. 01C01-9807-CC-00295, 1999 WL 173972, at *3 (Tenn. Crim. App. Mar. 30, 1999), *perm. app. denied* (Tenn. Oct. 11, 1999), states only that "'[d]iminished capacity' is not a *defense* in Tennessee" and that "[o]ur supreme court has discouraged the use of the phrase 'diminished capacity' because it poorly reflects the proper use of the evidence to 'negate the existence of the culpable mental state required to establish the criminal offense.'"

Contrary to the District Attorney General's argument, the law in Tennessee for years prior to the trial of this case clearly permitted the introduction of expert testimony that a criminal defendant lacked the capacity, because of mental disease or defect, to form the requisite culpable mental state to have committed the charged offense. *State v. Hall*, 958 S.W.2d 679, 689-90 (Tenn. 1997); *State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). Accordingly, the law did not support the District Attorney General's objection to Dr. Auble's testimony. Similarly, the law did not support the trial court's initial decision to exclude Dr. Auble's testimony altogether or its subsequent decision to permit Dr. Auble to testify but not regarding whether Mr. Mobley's mental condition prevented him from being able to premeditate at the time of the shootings.

With specific regard to the performance of Mr. Mobley's trial counsel, the law did not support his repeated concessions that he would refrain from asking Dr. Auble whether Mr. Mobley's mental condition rendered him incapable of premeditation. To the contrary, the cases cited by trial counsel during his discussions with the trial court regarding this issue explicitly permitted him to ask the "ultimate question" regarding whether Mr. Mobley was capable of forming premeditation at the time of the offense. The lack of understanding on the part of the District Attorney General and the trial court in no way excuses that of trial counsel. Accordingly, we find that Mr. Mobley's trial counsel's performance was deficient

---

[10]Mr. Mobley's current post-conviction counsel did not represent him during the trial and, therefore, was not in the courtroom during any part of the trial proceedings.

-12-

in connection with his concession that he would refrain from asking Dr. Auble's opinion regarding whether Mr. Mobley was incapable of premeditation.

**E.**

Our conclusion that Mr. Mobley's trial counsel's failure to elicit Dr. Auble's opinion regarding whether Mr. Mobley was capable of premeditation amounted to deficient performance does not necessarily mean that Mr. Mobley is entitled to a new trial on the ground of ineffective assistance of counsel. In order to be entitled to a new trial, Mr. Mobley must present evidence establishing the second prong of *Strickland v. Washington* – that the outcome of his trial would have been different had it not been for the deficient performance of his trial counsel.

At the outset, we have no basis to conclude that Mr. Mobley's counsel's misunderstanding of the applicable law impacted the trial court's initial decision to exclude Dr. Auble's testimony. In our view, counsel's misunderstanding led him to advocate the admission of a more circumspect version of the admissible evidence. Initially, the trial court was clearly not receptive to admitting any of Dr. Auble's testimony. We cannot conclude that there was a reasonable probability of a different evidentiary ruling from the trial court had Mr. Mobley's counsel steadfastly advocated for the admission of Dr. Auble's "ultimate issue" opinion.

Nor do we have any basis for finding that there was a reasonable probability of a different result after the State withdrew its objection to Dr. Auble's testimony. The trial court had already demonstrated its willingness to exclude Dr. Auble's testimony altogether. During initial discussions on the issue, the State specifically opposed Dr. Auble's "ultimate issue" opinion. The State continued to voice its opposition to this opinion after it withdrew its objection to other portions of Dr. Auble's testimony. Under these circumstances, we simply cannot conclude that there was a reasonable probability that the trial court would not have limited Dr. Auble's testimony, even if Mr. Mobley's trial counsel had advocated for admission of the "ultimate issue" opinion.

Morever, our examination of the trial record leads us to conclude that there was, in fact, no reasonable probability of a different result had Dr. Auble offered her "ultimate issue" opinion. We begin by noting that Mr. Mobley's trial counsel previewed Dr. Auble, by name, in his opening statement:

> I expect you'll hear from a doctor from Nashville, Tennessee, forensic psychologist, named Dr. Pam Auble. And Dr. Auble isn't going to come in here and try to excuse this but to try to help you understand why something like this could happen and

how. Dr. Auble will, I expect, be able to talk to you about the
mental state of Brandon Mobley at th[e] time this happened.

We also note that Mr. Mobley's counsel specifically identified premeditation as an issue multiple times during his opening statement. He suggested that the jury would hear evidence inconsistent with any notion that Mr. Mobley planned the shooting. Describing the expected proof, Mr. Mobley's counsel stated: "That's not quite how you would plan and premeditate and plot a murder or killing or a robbery." He asked the jury rhetorically, "Is that premeditation?" He also stated that "the evidence is going to be that this terrible thing happened, and your job is going to be to try to sort out why, and what was in his mind, and what his mental state was at the time this happened." Lastly, he specifically reminded the jury that the "burden is on the State to prove premeditation. They've got to prove the element of premeditation to you, and the Judge will instruct you about what premeditation is."

Our review of the record reveals that Mr. Mobley's counsel followed through on attempts to contest premeditation. He elicited testimony that it was Mr. Nance who called Mr. Mobley to arrange a meeting on the morning of the shooting. He also elicited testimony that Mr. Mobley carried a gun because he sold drugs and had been robbed only two and a half weeks before the shooting. In addition, he elicited testimony that evidence linking Mr. Mobley to the shooting, such as his gun, the towels used to clean Ms. Hoffman's car, and his shoes, was not well concealed after the shooting. Mr. Mobley's counsel also elicited testimony that items of value were found on Ms. Hoffman's body after the shooting. In short, he attempted to suggest that certain circumstances surrounding the shooting were inconsistent with premeditation.[11]

When she took the stand, Dr. Auble presented her testimony in much the same way it had been previewed during the defense's opening statement. She testified (1) that she met with Mr. Mobley three times before trial, (2) that she had conducted a variety of cognitive and personality tests, and (3) that she had investigated Mr. Mobley's background. Dr. Auble also testified that she had reviewed information about the offenses, including police reports, witness statements, crime scene information, and autopsy reports.

Based on her investigation and assessment, Dr. Auble related that Mr. Mobley had endured a difficult and chaotic home life as he grew up, leading him to have trouble trusting others. She opined that Mr. Mobley was likely to perceive others as hostile or threatening and also stated that Mr. Mobley was an immature adolescent who had difficulty controlling his emotions and impulses.

_____

[11]Not surprisingly, the State offered countervailing proof on many of these circumstances. Ultimately, the jury found the State's proof more persuasive.

-14-

From her investigation and testing, Dr. Auble diagnosed Mr. Mobley as having low intellectual functioning and a number of mental diseases or defects, including recurrent major depression, attention deficit hyperactivity disorder, and oppositional defiant disorder. She also testified that Mr. Mobley's depression would get better or worse over time in relation to different stressors in his life and related that Mr. Mobley had experienced several stressors in the months before the shooting. More specifically, he had been expelled from school in January 2003. In March 2003, he discovered that his girlfriend was pregnant, and he was involved in a serious accident in which emergency responders were required to cut him out of an automobile. In April 2003, Mr. Mobley was robbed.

Dr. Auble offered her opinion as to Mr. Mobley's mental state at the time of the shooting based on the entirety of her investigation and her diagnosis. With specific reference to Mr. Mobley's mental state, Dr. Auble testified that Mr. Mobley "tends to act without thinking" and "tends to respond first and then think about what he did later." She testified that Mr. Mobley was "someone who's impulsive, who reacts, who doesn't think," and, with specific reference to the shooting, she opined that Mr. Mobley responded "quickly," "impulsively," and "without thinking through what he was doing."

Mr. Mobley's counsel's closing argument again touched directly on the premeditation question. He reminded the jury of the State's burden to prove premeditation. He also told the jury that "Dr. Auble, a respected and well-known psychologist, came in and told us about Brandon's mental state." He also pointed out the circumstances he believed to be inconsistent with premeditation and argued, "You know, nothing that this boy did from the time he got up that morning until this was over made any sense. In fact, everything he did do totally denies any planning or premeditation." Lastly, Mr. Mobley's counsel asked the jury to carefully consider the lesser-included offenses of second degree murder and voluntary manslaughter.

Following closing arguments, the trial court instructed the jury regarding the elements of first degree premeditated murder. As for premeditation, the court instructed the jury that "[a] premeditated act is one done after the exercise of reflection and judgment." The instruction continued, "The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *See* Tenn. Code Ann. § 39-13-202(d) (2010). The trial court also instructed the jury as to lesser-included offenses that did not include the element of premeditation, including second degree murder and voluntary manslaughter.

Against this backdrop, Mr. Mobley contends that the result of his trial would likely have been different had Dr. Auble been able to add to her testimony the statement, "Thus, it is my opinion that because of his mental illnesses, Mr. Mobley would have been unable to

-15-

premeditate the crime of murder at the time of the shooting." We respectfully disagree. Based on our review, we find that the record supports the conclusion of the dissenting Court of Criminal Appeals judge that Mr. Mobley failed to establish a reasonable probability of a different result had Dr. Auble offered her "ultimate issue" opinion.

Mr. Mobley suggests that Dr. Auble's testimony "merely skirts around the key issue of whether [he] could premeditate." We disagree. The trial record reflects that Mr. Mobley's trial counsel, from opening statement through closing argument, put the issue of Mr. Mobley's capacity to premeditate at center stage. He identified Dr. Auble's testimony, along with a host of other facts, as being relevant to Mr. Mobley's mental state. The trial court instructed the jury that a premeditated act is one done after the exercise of reflection and judgment. In light of these circumstances, we decline to find that it is reasonably probable that the addition of Dr. Auble's "ultimate issue" opinion would have yielded a different result.

Mr. Mobley challenged the sufficiency of the evidence supporting his murder convictions on direct appeal. The Court of Criminal Appeals analyzed whether there was sufficient evidence of premeditation and ultimately concluded that there was. In this vein, the record contains proof from which a jury could conclude that Mr. Mobley called Mr. Nance to arrange a meeting, brought a gun to the meeting, shot the victims in the head at close range, exhibited calmness after the shooting, and attempted to dispose of evidence of the shooting. *State v. Mobley*, 2007 WL 1670195, at *10-11. Such circumstances support a finding of premeditation. *State v. Mobley*, 2007 WL 1670195, at *10 (citing *State v. Leach*, 148 S.W.3d 42, 53 (Tenn. 2004)). We do not mean to give the impression that the record contains no proof militating against a finding of premeditation. We merely point out that the record contains ample evidence from which a jury could find premeditation, thus militating against a conclusion that Dr. Auble's "ultimate issue" opinion was so vital that its absence undermines our confidence in the outcome of the trial.

## IV.

We next consider whether Mr. Mobley's trial counsel was ineffective by failing to prepare Mr. Mobley to testify and by failing to inform Mr. Mobley that he was not required to testify. While the resolution of these issues comes primarily from the proof adduced at the post-conviction hearing, we have also considered portions of the trial record bearing on the issues raised.

## A.

Mr. Mobley testified at the post-conviction hearing that he told his trial counsel at the beginning of his trial that he did not desire to testify. He also testified that he did not know

-16-

what to expect if he testified because his counsel did not prepare him to testify. In addition, he claimed that he did not know what the theory of his defense would be. After the trial court initially excluded Dr. Auble's testimony, Mr. Mobley asserted that his trial counsel told him, "if you don't testify, you'll automatically be found guilty." Mr. Mobley claimed he took the comment literally and that he believed the trial would be over if he did not testify.

Mr. Mobley's trial counsel related a different story at the post-conviction hearing. He stated that he had practiced law in Tennessee since 1985 and that he had previously handled seven or eight murder cases. He testified that he met with Mr. Mobley on more than twenty occasions.[12] In light of the possibility of a self-defense claim, he testified that he and Mr. Mobley had discussed Mr. Mobley's potential testimony from the very first meeting. According to Mr. Mobley's trial counsel, he discussed what Mr. Mobley would be expected to do in testifying and what he could expect on cross-examination. Although he could not recall whether he outlined potential testimony and delivered a copy to Mr. Mobley, Mr. Mobley's trial counsel testified that he and Mr. Mobley went over what his testimony would be if he testified at trial.

Mr. Mobley's trial counsel also testified that, like other murder cases he had handled, there were "bumps in the road" representing Mr. Mobley. However, he could recall only one non-productive meeting with Mr. Mobley prior to trial. He testified that this meeting occurred a few weeks before trial. Following this meeting, he sent Mr. Mobley a letter dated April 18, 2005.[13]

Counsel's letter indicates that during the meeting prior to writing the letter, Mr. Mobley did not wish to discuss the case and stated there was a conflict. In the letter, counsel assured Mr. Mobley that there was no conflict. The letter recounted reviewing every aspect of the case with Mr. Mobley over the prior year and stated that Mr. Mobley had been provided with the indictment, witness statements, forensic reports, autopsy reports, pleadings and other pertinent documents. The letter summarized the evidence against Mr. Mobley, and it outlined possible defenses, including the following statement:

> As you have told us, you feared for your life after they
> threatened to kill you over the money you owed them and
> Hoffman pulled a gun on you and you fired in self defense; that
> you did not walk down to meet them with any intention of

---

[12]Mr. Mobley testified that they met only five or six times. Mr. Mobley also testified that there was no discussion of the facts at their first meeting, no discussion of the facts at their second meeting, and "nothing but arguing and cussing" after their second meeting.

[13]Mr. Mobley testified that he never received the letter.

robbing or killing them. No matter what you may have been told or may believe, self defense is and has always been a defense in Tennessee. Your mental state at the time can be well explained and supported by Dr. Auble.

The letter continued, "As we have discussed, you do not have to testify in this case; you are, however, the only person who can explain what happened, why, and that you feared for your life."

Mr. Mobley's counsel testified that the issue was resolved and that he had productive meetings with Mr. Mobley following the non-productive meeting. He further testified that Mr. Mobley was engaged in his defense at trial. Interestingly, Mr. Mobley stated during his sentencing hearing that he and his lawyer had talked about the case "quite a bit."

In light of the conflicting testimony, the issue of whether Mr. Mobley's counsel prepared him to testify presents a classic credibility question. The post-conviction court resolved this question by accrediting counsel's testimony and by finding that Mr. Mobley's "protestations to the contrary are not credible." However, the Court of Criminal Appeals stated, "[t]he uncontroverted testimony of [Mr. Mobley] establishes that [he] . . . had not been prepared by trial counsel to take the stand." *Mobley v. State*, 2011 WL 3652535, at *17. Respectfully, we do not share this view of the record. Based on our review, the record contains ample evidence supporting the post-conviction court's finding. Accordingly, we conclude that Mr. Mobley has not offered clear and convincing proof of his allegation that Mr. Mobley's trial counsel did not prepare him to testify.

## B.

We now turn to Mr. Mobley's claim that his trial counsel was ineffective for failing to inform him that he did not have to testify. Mr. Mobley asserts that he was, in fact, called to testify against his will and faults his trial counsel for failing to ensure that his decision to testify was voluntary by prompting the trial court to conduct a proper hearing under *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999).

The Court of Criminal Appeals found the performance of Mr. Mobley's trial counsel was deficient with respect to the *Momon* issue. The court stated, "Counsel failed to object to the way in which the trial court conducted the hearing, and he failed to elicit from [Mr. Mobley] on the record a statement that [Mr. Mobley] had made a personal and voluntary decision to testify." *Mobley v. State*, 2011 WL 3652535, at *17. Nevertheless, the court concluded that Mr. Mobley was not prejudiced and denied post-conviction relief on this claim. *Mobley v. State*, 2011 WL 3652535, at *18. Mr. Mobley argues in this Court that the Court of Criminal Appeals erred in denying him relief.

-18-

Following the initial exclusion of Dr. Auble's testimony, Mr. Mobley's counsel called his client to the stand. The trial court, without prompting, stated, "we might as well go through a *Momon* hearing now." During a jury-out hearing, the trial court conducted a very brief colloquy with Mr. Mobley's counsel. The court asked counsel whether he had discussed the case with Mr. Mobley. The court also stated, "[Mr. Mobley] knows that he does not have to testify if he doesn't want to." Counsel responded that he had explained that fact to Mr. Mobley. The court followed up by stating, "And that if [Mr. Mobley] wants to, no one can keep him from testifying; or if he doesn't want to, no one can force him to testify." Mr. Mobley's counsel responded that Mr. Mobley understood. The trial court concluded by asking counsel if Mr. Mobley was choosing to testify of his own free will. Mr. Mobley's counsel responded, "[w]e've discussed it at length, Judge, and he understands it." The entirety of the discussion occurred between the trial court and counsel rather than between counsel and Mr. Mobley. However, Mr. Mobley was present throughout the conversation between the trial court and his counsel.

Mr. Mobley argues, and the Court of Criminal Appeals concluded, that his trial counsel was deficient by failing to insist on a proper *Momon* hearing. Both Mr. Mobley and the Court of Criminal Appeals acknowledged that *Momon* involved a criminal defendant who did not testify. Mr. Mobley contends that the principles of *Momon* should apply equally where, as here, a criminal defendant chooses to testify. The Court of Criminal Appeals stated simply that "we can see no reason why the *Momon* principles and procedures would not apply even though the defendant opted to testify." *Mobley v. State*, 2011 WL 3652535, at *16. We respectfully decline to extend the reach of the prophylactic procedure in *Momon* to instances in which a criminal defendant elects to testify.

In *Momon*, we found that Mr. Momon had been denied his constitutional right to testify in his own behalf because counsel alone decided not to have Mr. Momon testify. We pointed out the well-established principle that a criminal defendant has a fundamental constitutional right to testify at trial. *Momon v. State*, 18 S.W.3d at 157-61 (relying on the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution). We also pointed out the well-established principles that this fundamental right may be waived only by the defendant and that waiver of this fundamental right will not be presumed from a silent record. *Momon v. State*, 18 S.W.3d at 161-62. Accordingly, we adopted a prophylactic procedure designed to ensure that a defendant's waiver of the fundamental right to testify is voluntary, knowing, and intelligent.

To that end, when a defendant elects not to testify and to waive his fundamental constitutional right to do so, counsel must hold a colloquy with the defendant on the record, out of the presence of the jury, in which counsel should question the defendant to ensure that the defendant understands that:

(1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

(2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

*Momon v. State*, 18 S.W.3d at 162. We noted that the prophylactic procedure itself is not constitutionally required. *Momon v. State*, 18 S.W.3d at 163.

Our decision in *Momon* reflects a recognition that the waiver of a criminal defendant's fundamental constitutional right to testify must be voluntary, knowing, and intelligent. In this case, Mr. Mobley was not waiving his right to testify. To the contrary, he was exercising his right to testify. Were we to extend the *Momon* procedure to those defendants electing to testify, the practical result would be to require a *Momon* hearing in every criminal trial. This we decline to do.[14]

Moreover, the trial record plainly demonstrates that Mr. Mobley was advised on multiple occasions that he could choose to testify or not to testify. During a pretrial hearing when it was unclear whether Mr. Mobley desired to be present for his trial, the trial court directly advised Mr. Mobley:

> Finally, and very importantly, you have the right to testify in your own behalf if you wish. Now, that decision is completely yours. However, the advice of the attorney is very, very important in helping you to make your mind as to what your decision would be.
> Now, if you don't wish to testify you may – you may remain silent, but that again is your decision and yours alone,

---

[14]We have previously been reticent to expand upon *Momon*. For example, we have declined to expand the *Momon* inquiry to include informing the defendant in a capital case that he or she does not generally waive the privilege against self-incrimination by testifying to mitigating circumstances that are wholly collateral to the murder offense. *State v. Rimmer*, 250 S.W.3d 12, 28 (Tenn. 2008).

and, you, again, have the right to have his advice as to how you should proceed since he's been through this process more times than, of course, you.

As we have previously mentioned, immediately before Mr. Mobley testified at trial, he was present when the trial court stated to his trial counsel that Mr. Mobley "does not have to testify if he doesn't want to . . . [and] if he wants to, no one can keep him from testifying." At the post-conviction hearing, Mr. Mobley's trial counsel testified in no uncertain terms that he left the decision of whether to testify to Mr. Mobley and that Mr. Mobley made the decision to testify. Based on this record, we find no deficiency in trial counsel's failure to conduct a *Momon* hearing before Mr. Mobley testified.

## V.

We next consider Mr. Mobley's assertion that his relationship with his trial counsel was so adversarial that his counsel was unable to provide him effective assistance. We will address here all of Mr. Mobley's arguments relative to this issue except the claim relating to the use of the stun belt, which we will address in a later section of this opinion.

The testimony at the post-conviction hearing paints two very different pictures of the relationship between Mr. Mobley and his trial counsel. Mr. Mobley testified that the relationship was bitter and acrimonious, to the point that it consisted of little beyond "arguing and cussing" and involved no discussion of the facts. However, his trial counsel testified that the relationship was largely productive aside from one meeting a few weeks before trial. The post-conviction court explicitly found that Mr. Mobley's protestations lacked credibility, perhaps not surprisingly given the internal inconsistencies in Mr. Mobley's testimony at the post-conviction hearing.[15] Thus, based strictly on the post-conviction court's findings, we could easily conclude that Mr. Mobley has failed to establish by clear and convincing evidence that there was an acrimonious relationship between him and his trial counsel.

However, to better place Mr. Mobley's arguments in context, we will parse a portion of the trial record to which Mr. Mobley draws our attention. On the first morning of trial, before voir dire, Mr. Mobley refused to change into street clothes and come into the courtroom. His trial counsel commented, "Judge, I guess, in all candor, we probably need to bring Mr. Mobley out and let him address the Court, and I'll tell the Court what my

_____

[15]For instance, Mr. Mobley testified that in the five or six meetings with his trial counsel, the first two involved no discussion of the facts and the remaining meetings were nothing but "arguing and cussing." However, later in the post-conviction hearing, Mr. Mobley testified that by the Thursday before trial, he had "thoroughly explained" the facts with counsel. In this vein, Mr. Mobley testified that he had identified witnesses for his trial counsel to interview.

feelings are." Mr. Mobley then told the trial court that he and his trial counsel were incompatible because counsel had failed to prepare his defense properly, had failed to discuss the defense with him, and would necessarily hold a grudge against Mr. Mobley because of past arguments. Accordingly, Mr. Mobley stated that he could not trust trial counsel.

The trial court asked for trial counsel's response following Mr. Mobley's statements. Counsel stated that he had been working on Mr. Mobley's case for just over a year and had met with Mr. Mobley numerous times. He recounted conducting discovery investigations and obtaining the appointment of experts for psychological and mitigation evaluations, and he informed the trial court that Mr. Mobley had "raised some questions" a few weeks earlier, but thereafter "things leveled out" and there were no further problems. He recounted how he and Mr. Mobley had a lengthy meeting the Friday before the week of trial. Trial counsel concluded by saying, "Judge, you know it'd be awful easy for me to stand here and tell you that I've got a conflict in a difficult case like this, but, in all candor, I don't."

The trial court then asked whether communication between counsel and Mr. Mobley had been destroyed. Counsel responded that there had been no breakdown as of the Friday before the week of trial and that his investigator, Barry Rice, was outside the courtroom and would say the same thing. Mr. Mobley reiterated his belief that his counsel had failed to prepare his defense, that they had a conflict from the past, and that he could not work with his trial counsel.

The trial court called Mr. Rice to be brought into the courtroom and instructed the District Attorney General to examine Mr. Rice. Mr. Rice testified simply that he and Mr. Mobley's trial counsel had met many times with Mr. Mobley and had been able to discuss the case fully. He recounted a meeting a couple of weeks before trial in which Mr. Mobley complained, saying that he just was not happy with counsel. Mr. Rice also testified that Mr. Mobley had been kept abreast of the case and that he knew everything about the case that they knew. Mr. Rice also stated that there was nothing they could have done differently to prepare Mr. Mobley's case for trial.

Based on this information, the trial court stated that it could not find a breakdown of communication between Mr. Mobley and his trial counsel. The trial court ruled that "it appears that [Mr. Mobley's] dissatisfaction with [trial counsel's] preparation increased with the proximity of the trial. This Court has seen many of these motions in which the defendant wished to have another attorney but none so clear as this one that it should not be granted."

Against this factual background, we first consider Mr. Mobley's suggestion that his trial counsel should have moved to withdraw because his relationship with Mr. Mobley was acrimonious and that counsel rendered ineffective assistance by failing to withdraw. We have no hesitation in rejecting these contentions.

Once appointed, counsel for an indigent criminal defendant should not seek to withdraw unless compelled to do so and only upon good cause. *Parton v. State*, 455 S.W.2d 645, 649-50 (Tenn. Crim. App. 1970); *see* Tenn. Code Ann. § 40-14-205 (2012). Grounds upon which a trial court may order substitution of counsel include when counsel's representation is ineffective, when the defendant and counsel have become embroiled in an irreconcilable conflict, or when there has been a complete breakdown in communication between counsel and the defendant. *State v. Gilmore*, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991).

A defendant's refusal to cooperate with counsel does not necessarily justify substitution of counsel. *State v. McClennon*, 669 S.W.2d 705, 707 (Tenn. Crim. App. 1984). As we have previously observed, although the United States Constitution and the Constitution of Tennessee guarantee an indigent criminal defendant the right to assistance of counsel, the right does not include counsel of choice, special rapport with counsel, confidence in counsel, or even a meaningful relationship with counsel. *State v. Carruthers*, 35 S.W.3d 516, 546 (Tenn. 2000); *see also Morris v. Slappy*, 461 U.S. 1, 13-14 (1983). The essential aim is to guarantee an effective advocate, not counsel preferred by the defendant. *State v. Carruthers*, 35 S.W.3d at 546 (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)).

Mr. Mobley suggests that his trial counsel was obligated to withdraw in spite of counsel's beliefs that he was prepared for trial, that there was no conflict between himself and Mr. Mobley, and that there had been no breakdown in communication. We cannot agree with this suggestion. Counsel's beliefs were reflected in both the trial record and the post-conviction record, and they were accredited by both the trial court and the post-conviction court. Mr. Mobley's trial counsel was in no way deficient for failing to move to withdraw.

With regard to his assertion that his relationship with his trial counsel was adversarial, Mr. Mobley focuses criticism upon counsel's examination of Mr. Rice during the pretrial hearing on Mr. Mobley's request for substitute counsel. Mr. Mobley contends that his trial counsel undermined his credibility by questioning Mr. Rice in such a way as to challenge his allegations. We find Mr. Mobley's contentions wholly untenable.

The record reflects that Mr. Mobley complained to the trial court about his trial counsel and requested appointment of new counsel. As was to be expected, the trial court conducted a hearing to inquire into the matter. It strains reason to suggest that the trial court could not hear evidence on those aspects required for disposition of the issue, including whether counsel was prepared for trial, whether the defendant and counsel were embroiled in an irreconcilable conflict, or whether there existed a complete breakdown in communication between counsel and the defendant. *See State v. Gilmore*, 823 S.W.2d at 568-69. Mr. Rice offered such evidence.

It also strains reason to suggest that Mr. Mobley's trial counsel rendered deficient performance, exhibited an irreconcilable conflict, or prejudiced Mr. Mobley by questioning Mr. Rice. Mr. Mobley's counsel responded to the trial court's inquiry. His questions of Mr. Rice were primarily general ones on the subject of whether counsel was prepared for trial.[16] We simply cannot find that Mr. Mobley's trial counsel somehow rendered ineffective assistance in this regard. Accordingly, we conclude that Mr. Mobley failed to establish by clear and convincing evidence that an adversarial relationship existed between himself and his trial counsel that rendered counsel unable to provide effective assistance.

## VI.

We turn now to the final allegation of ineffective assistance of counsel. Mr. Mobley asserts that his trial counsel was ineffective for failing to object to the use of a stun belt[17] during the trial. We have determined that the manner in which this issue was developed at the post-conviction hearing left more questions than answers.

## A.

The record with respect to this issue is, in a word, puzzling. In his pro se petition for post-conviction relief, Mr. Mobley did not identify the use of the stun belt as the basis for any of his claims for relief. Likewise, Mr. Mobley's first amended petition for post-conviction relief did not identify the use of the stun belt as the basis for any of his claims for relief. The first mention of the stun belt issue occurred in 2009 when Mr. Mobley filed an amendment to his petition for post-conviction relief. Mr. Mobley alleged in that amendment that he had been forced to wear a stun belt at trial without any finding of necessity. Mr. Mobley contended that his trial counsel was ineffective in this regard and that the use of the stun belt violated his due process rights.

---

[16]We also point out that during the initial examination of Mr. Rice by the District Attorney General, Mr. Rice was explicitly cautioned to avoid revealing confidential information. Indeed, Mr. Rice's testimony was general in nature, had nothing to do with specifics of the defense, and was limited to the relationship between counsel and Mr. Mobley and whether counsel was prepared for trial.

[17]Stun belts are a method of restraint used as an alternative to shackles. *Gonzalez v. Pliler*, 341 F.3d 897, 899 (9th Cir. 2003). A stun belt is a device worn on a person's body that can be remotely activated to deliver an electrical shock to an individual who becomes violent or unruly. Douglas R. Kendrick, *United States v. Durham: Are the Criminal Defendant's Rights at Trial Violated by Wearing a Stun Belt?*, 26 Am. J. Trial Advoc. 711, 711 (2003). The electrical shock is designed to temporarily immobilize the wearer. *United States v. Durham*, 219 F. Supp. 2d 1234, 1238-39 (N.D. Fla. 2002); *Wrinkles v. State*, 749 N.E.2d 1179, 1193-94 (Ind. 2001). There appear to be two general types of stun belts, one a clearly visible belt ordinarily used for tasks such as transporting prisoners, and the other a belt that is worn under the clothing and is, as a result, more commonly used in courtroom appearances. *People v. Mar*, 52 P.3d 95, 103 (Cal. 2002).

To place this issue in context, we first review portions of the trial record in detail. Before the trial commenced, Mr. Mobley refused to "dress out" and come into the courtroom. The record contains a statement from an unidentified court officer that Mr. Mobley was "not wanting to change clothes. He thinks it's not going to trial." Immediately after the court officer's statement, Mr. Mobley's trial counsel spoke with Mr. Mobley and then returned to the courtroom. He stated, "Judge, I guess, in all candor, we probably need to bring Mr. Mobley out and let him address the Court, and I'll tell the Court what my feelings are." When the trial court inquired whether Mr. Mobley would come into the courtroom, an unidentified court officer stated, "He said he'll come out because he wants to address the Court."

Mr. Mobley entered the courtroom, informed the trial court that he believed he and his trial counsel were incompatible, and requested appointment of new counsel. At this point, the trial court delved into the relationship between Mr. Mobley and his counsel, as detailed above in Section V. The trial court heard from Mr. Mobley, the District Attorney General, Mr. Mobley's trial counsel, and Mr. Rice. At the conclusion of the discussion, the trial court denied Mr. Mobley's request for appointment of new counsel.

At this point, the trial court addressed Mr. Mobley directly. The trial court informed Mr. Mobley that it was in his best interest to change into "street clothes" for trial and concluded with the following remarks:

> Now, you must give this some thought, not much because we're going to start this trial. You must also know that if – if there's any attempt on your part to disturb the proceedings of this court or any other court, the Court has the power of contempt and along with contempt can order you placed under chains, gagged, and brought into the courtroom before the jury which has another indicia of your status.
>
> In the event that you keep on disturbing the proceedings of this Court, you will be excluded from the court. Your attorney will be allowed to come to you to tell you what the last witness said. You won't be able to participate in your trial. You must consider these very intensively because what you do today may affect the rest of your life.

The trial court ordered a recess so that Mr. Mobley could discuss the matter with his trial counsel.

The record next reflects that Mr. Mobley's trial counsel informed the trial court that Mr. Mobley would not return to the courtroom. Thereafter, a discussion ensued between the trial court, Mr. Mobley's trial counsel, and the District Attorney General regarding the possibility of trying Mr. Mobley in absentia. The District Attorney General expressed some reticence and suggested, "We think that the best course of action is for the Court to bring Mr. Mobley back to the counsel table and explain to him what rights he forfeits if he is not present in the courtroom" and "to try to convince him, of course, to remain in the courtroom." Mr. Mobley's counsel agreed with the District Attorney General and added, "I really need to know what he's going to do because it's going to affect every aspect of this case."

At this point, the trial court ordered a bench conference. The following discussion took place between the trial court, Mr. Mobley's counsel, and an unidentified court officer:

> Court Officer: Of course, he'll probably come out here. If I tell him he needs to come out here to put this stuff on the record, he'll come out for that because that's how I got him the last time, telling him that if he was going to try to fire his attorney it had to be on the record, and he was agreeable to that. But then once it reaches the other point, he's just going to turn and walk out, I'm afraid. Okay? Now, my suggestion is that we can put the shock belt on him, and then that way he'll know if he starts acting up - -
>
> The Court: That's all right.
>
> [Mr. Mobley's Counsel]: That's not a bad idea, I mean, at this point.
>
> Court Officer: I mean that's only an idea.
>
> The Court: Okay.
>
> [Mr. Mobley's Counsel]: I mean, she [the Court Officer][18] heard most of what went on.

_____

[18]The trial record does not definitively establish the identity of the "she" in this exchange. The implication based on those individuals identified as participating in the discussion is that "she" refers to the court officer. Additionally, the stipulation entered during the post-conviction proceedings appears to confirm that "she" refers to the court officer.

The discussion then turned to case law on the subject of whether a criminal defendant may choose not to be present for trial.

Following a lunch recess, the trial court again took up the issue of the possible procedure for trying Mr. Mobley in absentia. It is unclear whether Mr. Mobley was present for the entirety of this discussion. What is clear is that at the conclusion of the discussion, the trial court directly addressed Mr. Mobley. The trial court explained to Mr. Mobley that if he chose not to be present for trial, he would be foregoing many important opportunities for input into the trial, from jury selection to examination of witnesses. The trial court also explained Mr. Mobley's right to choose whether or not to testify in his own behalf. The trial court concluded the discussion with the following colloquy with Mr. Mobley:

> The Court: Now, Young Man, I don't know what your age is, but as I said before you would be making a decision that would affect the rest of your life if you don't have these privileges. And I want to ask you sincerely, do you feel that you could allow the trial to go forward without your presence?
>
> Mr. Mobley: No, sir. That's why I'm ready to get my - - my street clothes on - -
>
> The Court: All right.
>
> Mr. Mobley: - - get these cuffs and everything on and get this thing on the road - -
>
> The Court: All right. That's fine.
>
> Mr. Mobley: - - before we waste any more of the Court's time.
>
> The Court: Okay. All right. Let's do that, and we'll remove the handicap, and - - and you - - you understand what I said earlier about any probable or possible disturbance in the courtroom - -
>
> Mr. Mobley: Yes, sir, I do.
>
> The Court: - - that that will be carried out. All right. We have to have a stable audience and personnel in order to give you your rights as a defendant. Okay. All right. Let's - - all right. Let's take a short recess until he's ready.

With that exchange, the trial commenced and proceeded to verdict without any indication of a disturbance in the proceedings. The trial record contains no further discussion of the stun belt. As a result, the trial record does not demonstrate when or even if a stun belt was placed on Mr. Mobley.

As for the post-conviction record, the proof with respect to the stun belt, like many other aspects of this case, presented diverging stories. Mr. Mobley testified in no uncertain terms that a stun belt was placed on him during trial. He testified that the stun belt was placed on his inner thigh in the holding cell behind the courtroom and that the person who placed the stun belt on him was "kind of a heavier white guy" in "a short sleeve black t-shirt and some black pants and some black boots" rather than an official uniform. He also testified that this man was approximately six feet five inches tall and did not have a badge and that he had not seen this person previously. According to Mr. Mobley, the man "told me that they said that they didn't want no disruptions out of me because I wouldn't dress out."

Mr. Mobley described the stun belt simply as "maybe six by eight" and three inches thick, all black, with a Velcro strap, that fit under his clothes on his left thigh.[19] According to Mr. Mobley, the man who placed the stun belt on him demonstrated the stun belt. The man also showed Mr. Mobley the device used to activate the stun belt and told him where the person with the activation device would be located in the courtroom. That person was not the same one who placed the stun belt on his leg. The post-conviction record does not reveal whether Mr. Mobley received instructions regarding the sort of behavior that would trigger the activation of the stun belt.

According to Mr. Mobley, the stun belt was placed on him on the first day of trial just before the colloquy with the trial court in which Mr. Mobley voiced his desire to commence the trial rather than "waste anymore of the Court's time." Mr. Mobley testified that the stun belt remained on him until the fourth and fifth days of trial, which consisted of closing arguments, the jury charge, jury deliberations, and the announcement of the verdict. As for discussions with his trial counsel regarding the use of the stun belt, Mr. Mobley testified that he had no conversation with counsel other than telling counsel that he did not see a reason for its use.

---

[19]We note that Mr. Mobley's description of the stun belt as attaching to his thigh distinguishes it from those most often described in case law. *See*, *e.g.*, *United States v. Durham*, 219 F. Supp. 2d at 1238 (describing the stun belt as attaching to the waist with two nine-volt batteries connected to prongs over the left kidney region); *Wrinkles v. State*, 749 N.E.2d at 1193 (describing the stun belt as attaching to the waist with two nine-volt batteries connected to prongs over the left kidney region). There was very little testimony at the post-conviction hearing concerning the attributes of the stun belt used on Mr. Mobley. Not surprisingly, then, the post-conviction court made no findings in this regard. Given these circumstances, we are unable to draw any firm conclusions regarding the specific functional characteristics of the stun belt used on Mr. Mobley.

When asked if the stun belt "interfered with [his] ability to testify," Mr. Mobley testified, "I mean, that and a lot of other things that contributed to that." This statement is the extent of Mr. Mobley's description of the effect the stun belt had on his testimony at trial.

At the post-conviction hearing, Mr. Mobley's counsel's recollection regarding the stun belt was not as detailed as Mr. Mobley's. He "recall[ed] some discussion about a shock belt," but he did not recall the specific statements reflected in the trial transcript. He testified that he did not believe the stun belt's use would make much difference because the jury could not see it. He also testified that he did not recall discussing the stun belt's use with Mr. Mobley, but he added that he did not think its use would make much difference to Mr. Mobley.

Curiously, in spite of the presence in the trial transcript of the reference to the use of a stun belt, there were two witnesses from the Knox County Sheriff's Office whose testimony at the post-conviction hearing suggested that stun belts were not in use at the time of Mr. Mobley's trial. One of these witnesses offered a limited explanation of the procedure typically employed when using a stun belt. In this vein, the witness offered testimony that the stun belt is activated in a defendant's presence for demonstration purposes. The stun belt vibrates and emits a distinct humming sound. As for instructions to a defendant, the witness stated, "If they become aggressive or anything of that nature then it is possible that . . . they will be given a warning and then it will be activated." The witness continued by stating that defendants are told "that they lose physical control for the period that it's being activated. And it's a cycle. An eight second cycle."

At the conclusion of the post-conviction hearing, the State argued that there was no credible evidence that a stun belt had been used on Mr. Mobley at trial. The post-conviction court took the matter under advisement. Thereafter, Mr. Mobley filed a post-hearing memorandum for the purpose of "call[ing] the Court's attention to the location of evidence regarding some of the claims." This memorandum contains a footnote that reads:

> After the evidentiary hearings on this matter, the Court advised both counsel that it received additional information regarding the manner in which the stun device came to be used on Mr. Mobley, and it is anticipated that the parties will be entering into a stipulation regarding that additional testimony.

A stipulation does indeed appear in the post-conviction record in which the State stipulated to the admissibility of the statements contained therein rather than to their truth.

The stipulation is signed by Deputy Sheriff Tylenia Miller and indicates that she served as a court officer during Mr. Mobley's trial and post-conviction hearing. She is

identified as "Court Officer" in the trial transcript. The stipulation reads, in pertinent part, as follows:

> Officer Miller clearly recalls Mr. Mobley and the circumstances surrounding his trial. Ms. Miller had significant contact with Mr. Mobley and had discussions with him about his desire not to go to trial with his attorney. She discussed with him the need to go into the courtroom. Mr. Mobley did not give the court officers any problem. He was polite and cooperative with them.
>
> A stun/shock device was placed on Mr. Mobley's leg prior to trial, and he wore it during the trial. Officer Miller witnessed the device being placed on Mr. Mobley. The device was not placed on Mr. Mobley by the court services division because they did not have one at the time. Law enforcement officers from the Sheriff's Office were brought in to put the device on Mr. Mobley. The device was placed on Mr. Mobley at the request of Mr. Mobley's attorney, who stated that he was afraid of Brandon Mobley.[20]

At the end of the stipulation is a handwritten notation signed by the post-conviction court indicating that the stipulation was taken into consideration in rendering the decision on Mr. Mobley's claims for relief.

The post-conviction court ultimately denied relief. The court made the following findings:

> In part two of defendant's post-hearing memorandum he complains of [trial counsel's] acquiescence in having the defendant wear a stun belt or a shock belt during the trial. After reviewing the record, it appears that on the morning of trial the defendant became extremely agitated and, at one point, actually refused to come into the courtroom. Given that half of [trial counsel's] strategy[21] depended on the defendant making a good witness on the stand and making a good impression on the jury,

---

[20]There is no other indication in the trial record or in the remainder of the post-conviction record that Mr. Mobley's trial counsel ever expressed fear of Mr. Mobley.

[21]The post-conviction court found that Mr. Mobley's trial counsel had developed a two-pronged defense strategy: self-defense and lack of premeditation.

it is reasonable that he wanted to make sure he did not disrupt the trial. His concern was justified given the defendant's low intellectual functioning and his extreme agitation. Also, the belt was not visible to the jury.

In contrast, the Court of Criminal Appeals concluded that Mr. Mobley's trial counsel provided deficient representation "by not only agreeing to the use of the shock belt but also actively suggesting its use despite no showing of necessity." However, the Court of Criminal Appeals concluded that Mr. Mobley failed to establish prejudice because he did not specify "in what way his testimony would have been different had the shock belt not been implemented." *Mobley v. State*, 2011 WL 3652535, at *15.

**B.**

We have not had occasion to address the use of stun belts as an in-court restraint measure for criminal defendants. However, Tennessee courts long ago addressed the use of a more traditional restraint measure – visible shackles. *See Willocks v. State*, 546 S.W.2d 819 (Tenn. Crim. App. 1976). The *Willocks* court held that there is a legal presumption against the use of visible restraints in court that flows from due process guarantees to a fair trial. *Willocks v. State*, 546 S.W.2d at 820-21. Federal precedent is firmly in accord. *See Deck v. Missouri*, 544 U.S. 622, 629 (2005).

Tennessee law, consistent with federal precedent, affords the trial court discretion with respect to the decision to employ shackles, but the State bears the burden of demonstrating necessity. *Willocks v. State*, 546 S.W.2d at 821-22; *see Deck v. Missouri*, 544 U.S. at 626-32. As for those reasons supporting the use of shackles, Tennessee law has recognized preventing the escape of the defendant, protecting individuals in the courtroom, and maintaining order during trial. *State v. Thompson*, 832 S.W.2d 577, 580 (Tenn. Crim. App. 1991); *Willocks v. State*, 546 S.W.2d at 820 (citing *Woodards v. Cardwell*, 430 F.2d 978, 982 (6th Cir. 1970)); *see also Deck v. Missouri*, 544 U.S. at 628 (recognizing escape prevention, physical security, and courtroom decorum as essential state interests potentially served by in-court restraints).

When requiring shackles, the trial court must place findings of necessity on the record. In fact, the better practice is to hold a hearing so that factual disputes may be resolved and evidence concerning the use of shackles may be placed in the record. *Willocks v. State*, 546 S.W.2d at 822. The trial court must employ the least drastic security measure necessary to accomplish the objective. *Willocks v. State*, 546 S.W.2d at 822 ("[I]t is an abuse of discretion precipitously to employ shackles when less drastic security measures will adequately and reasonably suffice.") (quoting *Kennedy v. Cardwell*, 487 F.2d 101, 111 (6th Cir. 1973)). Lastly, in the event the defendant is shackled in view of the jury, the trial court must give a

cautionary instruction that the shackling should not influence the jury's decision. *Willocks v. State*, 546 S.W.2d at 822.

In recent years, the use of a stun belt as an in-court restraint has emerged as an alternative to shackling. It would appear that one of the reasons for the emergence of the stun belt option is that the device is relatively easy to conceal from the jury's view. It is well recognized that due process affords a criminal defendant the physical indicia of innocence. *Willocks v. State*, 546 S.W.2d at 820. The use of visible restraints undermines the physical indicia of innocence and the related fairness of the fact-finding process. *Deck v. Missouri*, 544 U.S. at 630. This concern has been significant in the development of the presumption against the use of visible restraints. *Deck v. Missouri*, 544 U.S. at 630-31. A restraint that is not visible to the jury obviously does not implicate this concern to the extent a visible restraint does. *See Stevens v. McBride*, 489 F.3d 883, 899 (7th Cir. 2007) (describing the stun belt as a method of restraint that minimizes the risk of prejudice because it is hidden beneath a defendant's clothing).

However, the physical indicia of innocence implicated by visible restraints is not the only legal principle at issue. Physical restraints can interfere with a defendant's ability to communicate with counsel. *Deck v. Missouri*, 544 U.S. at 631. Additionally, physical restraints can interfere with a defendant's ability to offer testimony in his or her own behalf. *Deck v. Missouri*, 544 U.S. at 631 (citing *People v. Harrington*, 42 Cal. 165, 168 (1871) (noting that shackles tend to confuse and embarrass the defendant's mental faculties)). Lastly, physical restraints can undermine the symbolic yet concrete objective of maintaining a dignified judicial process. *Deck v. Missouri*, 544 U.S. at 631-32.

Picking up on these concepts, other courts that have considered the use of stun belts have often implemented approaches similar to those used for shackles. *See, e.g., United States v. Miller*, 531 F.3d 340, 345 (6th Cir. 2008) (concluding that the same fundamental issues are implicated in the use of a stun belt as in shackling and, thus, a decision to use a stun belt must be subjected to the same judicial scrutiny required for the use of other physical restraints); *Gonzalez v. Pliler*, 341 F.3d at 900 (stating that the use of stun belts raises all of the traditional concerns about the imposition of physical restraints); *United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002) (holding that a decision to use a stun belt must be subjected to the same judicial scrutiny required for the imposition of other physical restraints); *State v. Cruz*, 181 P.3d 196, 215 (Ariz. 2008) (en banc) (concluding that a trial court has the discretion to require the use of a stun belt upon a finding of necessity after a hearing); *State v. Powell*, 56 P.3d 189, 201 (Kan. 2002) (concluding that a trial court has the discretion to require the use of a stun belt upon a finding of necessity and that the restraint is the least restrictive necessary for the specified purposes); *People v. Mar*, 52 P.3d at 97-98, 105-06 (concluding that a trial court has the discretion to require the use of a stun belt after a hearing upon a finding of manifest need and that the device is not more onerous than

necessary to satisfy the court's security needs); *State v. Flieger*, 955 P.2d 872, 874 (Wash. Ct. App. 1998) (concluding that a trial court has the discretion to require the use of a stun belt after a hearing upon a finding of need and that the control imposed ensures an orderly trial with the least interference with the defendant's rights). Interestingly, the Supreme Court of Indiana instituted a prospective ban on the use of stun belts altogether, concluding that other forms of restraint are satisfactory "without inflicting the mental anguish that results from simply wearing the stun belt and the physical pain that results if the belt is activated." *Wrinkles v. State*, 749 N.E.2d at 1194-95 (noting with approval that a pain infliction device that has the potential to compromise an individual's ability to participate in his or her own defense does not belong in a court of law).

Although we are disinclined at this point to hold that a stun belt may not be used as an in-court restraint on a criminal defendant, we agree with the aforementioned courts that have found that the use of a stun belt implicates many of the same principles as the use of shackles. We are loathe to approve the use of a stun belt without a finding of necessity simply because a stun belt is ordinarily not visible. Accordingly, we conclude that the principles and procedures set forth in *Willocks* apply to the use of a stun belt as an in-court restraint.

To that end, we reiterate that there is a legal presumption against the use of in-court restraints. *Willocks v. State*, 546 S.W.2d at 821. To justify the use of restraints, the State bears the burden of demonstrating necessity that serves a legitimate interest, such as preventing escape, protecting those present in the courtroom, or maintaining order during trial. *State v. Thompson*, 832 S.W.2d at 580; *Willocks v. State*, 546 S.W.2d at 820. The trial court should consider all relevant circumstances, including without limitation: (1) the defendant's circumstances, such as record of past behavior, temperament, and the desperateness of his or her situation; (2) the state of the courtroom and courthouse; (3) the defendant's physical condition; and (4) whether there is a less onerous but adequate means of providing security. *Lakin v. Stine*, 431 F.3d 959, 964 (6th Cir. 2005); *Kennedy v. Cardwell*, 487 F.2d at 110-11. The trial court should consider the relevant circumstances against the backdrop of affording the defendant the physical indicia of innocence, ensuring the defendant's ability to communicate with counsel, protecting the defendant's ability to participate in his or her defense and offer testimony in his or her own behalf, and maintaining a dignified judicial process. *See Deck v. Missouri*, 544 U.S. at 630-32.

The trial court must make particularized findings, and the better practice is to hold a hearing on the issue so that factual disputes may be resolved and evidence surrounding the decision may be adduced and made part of the record. *Willocks v. State*, 546 S.W.2d at 822. Only in this way will the record allow for meaningful appellate review. Of course, the decision to require the use of a stun belt is addressed to the sound discretion of the trial court. *State v. Thompson*, 832 S.W.2d at 580. As a final note, we point out that should a stun belt

inadvertently become visible to the jury, the trial court should give cautionary instructions that it should in no way affect the jury's determinations. *See Willocks v. State*, 546 S.W.2d at 822.

## C.

Having set forth the principles governing the use of a stun belt as an in-court restraint, we return to the primary issue presented here, namely whether Mr. Mobley's trial counsel rendered ineffective assistance by failing to object to the use of a stun belt on Mr. Mobley. We have determined that the current record is insufficient to enable us to address this issue. While we acknowledge that the post-conviction court did not have the benefit of our discussion of the principles surrounding the use of a stun belt, we must reverse the denial of relief as to this issue and remand for further proceedings.

The post-conviction court appears to have concluded that the performance of Mr. Mobley's trial counsel with respect to the stun belt was not deficient. In particular, the post-conviction court found that because the claim of self-defense was best supported through the testimony of Mr. Mobley, it was reasonable for Mr. Mobley's counsel to want to ensure that Mr. Mobley made a good impression on the jury rather than disrupt the proceedings as he had when he refused to dress out before the trial started. The Court of Criminal Appeals saw the issue differently. It concluded that Mr. Mobley's trial counsel performed deficiently not only by agreeing to the use of the stun belt but also by actively suggesting its use despite no showing of necessity. *Mobley v. State*, 2011 WL 3652535, at *15.

We agree with the post-conviction court that Mr. Mobley's claim of self-defense was best supported through his own testimony, and thus, that his demeanor before the jury was of keen importance. However, like the Court of Criminal Appeals, we find that agreeing to the suggestion of using a stun belt without discussing the matter with Mr. Mobley was not within the range of competence demanded of Mr. Mobley's trial counsel.

Unlike the Court of Criminal Appeals, however, we are not prepared to conclude on the present record that Mr. Mobley failed to show any prejudice stemming from the use of the stun belt. The post-conviction court's findings with respect to prejudice are limited. Indeed, the post-conviction court's only finding was that the stun belt was not visible to the jury. Certainly this finding is significant because, as we have previously explained, the use of visible restraints undermines the physical indicia of innocence and the related fairness of the fact-finding process. *Deck v. Missouri*, 544 U.S. at 630. Thus, the fact that the stun belt was concealed militates against prejudice in this respect.

However, Mr. Mobley alleged that the stun belt interfered with his ability to testify because it was always "on his mind." The post-conviction court made no findings at all with

regard to the effect that wearing the stun belt had on Mr. Mobley's testimony. As we previously explained, the use of a stun belt may potentially impact a defendant's mental faculties so as to interfere with the ability to offer testimony in his or her own behalf. *Deck v. Missouri*, 544 U.S. at 631. Accordingly, we have concluded that the post-conviction court should have addressed Mr. Mobley's allegation that the stun belt was always "on his mind" while he was testifying.

Certainly a principal aspect of evaluating Mr. Mobley's allegation hinges on a credibility assessment by the post-conviction court, which has the benefit of hearing witness testimony firsthand. Yet it would also behoove the post-conviction court to examine the trial record in detail to aid in its assessment of Mr. Mobley's allegation of an impact from the use of the stun belt. We do not doubt that, from a written record, it is difficult to determine with a great degree of precision the impact of the presence of a stun belt on witness demeanor. However, the post-conviction court should evaluate Mr. Mobley's post-conviction claim in light of anything in the trial record tending to support or detract from Mr. Mobley's allegation. *See State v. Bates*, 125 P.3d 42, 46 (Or. Ct. App. 2005) (noting that the written record of the defendant's testimony was not marked by any obvious sign of anxiety); *People v. Mar*, 52 P.3d at 110 (noting that the trial transcript confirmed that the defendant was nervous while testifying).

Based on the foregoing discussion, we reverse the post-conviction court's denial of post-conviction relief as to Mr. Mobley's allegation of ineffective assistance of counsel stemming from the use of the stun belt at trial. Because of the unusual procedural and substantive nature of the post-conviction proceedings with regard to the stun belt issue, we remand the case to the post-conviction court to conduct further hearings in light of the principles regarding the use of stun belts contained in this opinion. This hearing should address (1) the circumstances surrounding the decision to require Mr. Mobley to wear a stun belt at his trial, (2) whether Mr. Mobley's trial counsel's performance was deficient with regard to the decision to require Mr. Mobley to wear the stun belt, (3) whether requiring Mr. Mobley to wear a stun belt at trial had an adverse effect on his demeanor or his ability to testify at trial, and (4) whether the adverse affect, if any, was sufficient to undermine confidence in the outcome of Mr. Mobley's trial. In addition to considering the evidence introduced at this hearing, the post-conviction court may also consider and give appropriate weight to the record of Mr. Mobley's original trial and the record of the earlier post-conviction proceedings.

## VII.

In addition to his allegations of ineffective assistance of counsel, Mr. Mobley takes issue with three alleged errors on the part of the trial court. More specifically, Mr. Mobley argues: (1) that the trial court denied him the right to effective counsel by calling Mr. Rice

as a witness when he requested the appointment of new counsel, thereby interfering with the attorney-client relationship; (2) that the trial court denied him due process by ordering the use of a stun belt without a hearing; and (3) that the trial court denied him the opportunity to personally waive his right to testify by failing to conduct a proper *Momon* hearing. We will address these issues in turn, but we need not tarry long on them.

## A.

In the argument section of his brief in this Court, Mr. Mobley contends that the trial court denied him the right to effective counsel by calling Mr. Rice as a witness when he requested the appointment of new counsel prior to the commencement of trial. However, Mr. Mobley did not identify this issue in the Statement of the Issues in his brief.

In its Tenn. R. App. P. 11 application and in its brief in this Court, the State presented its single issue as whether the Court of Criminal Appeals erred by concluding that Mr. Mobley's trial counsel was ineffective for failing to ask Dr. Auble whether Mr. Mobley lacked the capacity to premeditate. Mr. Mobley identified three issues in the Statement of the Issues in his brief. First, Mr. Mobley effectively restated the issue pertaining to Dr. Auble. Second, Mr. Mobley identified whether he received ineffective assistance of counsel as a result of the complete breakdown of the attorney-client relationship, with a specific reference to trial counsel's failure to object to the use of the stun belt. Third, Mr. Mobley identified the following:

> Whether Due Process violations require a new trial where Mr. Mobley was forced to wear a shock device during the entire trial, although he had never engaged in any misbehavior in court, and the trial court did not ever hold a hearing on the use of the shock device and where Mr. Mobley testified at trial counsel's direction and without a proper *Momon* hearing at which time he could have expressed his desire not to testify.

However, in the argument section corresponding to his third issue, Mr. Mobley claimed that "the trial court erroneously called a private investigator for the defense to testify against Mr. Mobley regarding confidential and privileged attorney-client communications," thereby depriving Mr. Mobley of his right to effective counsel.

We have recently had occasion to emphasize the importance of properly presenting issues for review, noting that "[r]ather than searching for hidden questions, appellate courts prefer to know immediately what questions they are supposed to answer." *Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012). Parties who have not filed their own application for permission to appeal may present issues other than those presented by the appellant or party

seeking Tenn. R. App. P. 11 relief. Yet such parties must do so in accordance with the requirements of Tenn. R. App. P. 27. As a result, an issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4). *Hodge v. Craig*, 382 S.W.3d at 334.

Mr. Mobley's third issue in the Statement of the Issues identifies two trial court errors as the basis for post-conviction relief, one involving the trial court's decision to require Mr. Mobley to wear a stun belt, and the other involving the trial court's failure to conduct a proper *Momon* hearing. Mr. Mobley's third issue does not identify a claim involving the trial court's decision to call Mr. Rice as a witness. Because Mr. Mobley failed to properly designate as an issue his contention that the trial court denied him the effective assistance of counsel by calling Mr. Rice as a witness, we deem it waived.

**B.**

Mr. Mobley also insists that the trial court denied him due process by ordering the use of a stun belt without a hearing. However, the record establishes that Mr. Mobley did not present this issue to the trial court or upon direct appeal. We therefore agree with the Court of Criminal Appeals that Mr. Mobley waived this due process claim, *see* Tenn. Code Ann. § 40-30-106(g), and that the stun belt issue is more properly considered in the context of Mr. Mobley's claim of ineffective assistance of counsel.

**C.**

Mr. Mobley finally contends that the trial court denied him the opportunity to personally waive his right to testify by failing to conduct a proper *Momon* hearing. Once again, we agree with the Court of Criminal Appeals that Mr. Mobley waived this claim by not presenting it to the trial court or on direct appeal, *see* Tenn. Code Ann. § 40-30-106(g), and that the issue is more properly considered in the context of Mr. Mobley's claim of ineffective assistance of counsel.

**VIII.**

We affirm the judgments of the post-conviction court and the Court of Criminal Appeals denying post-conviction relief with regard to Mr. Mobley's claims based on alleged errors of the trial court and on all ineffective assistance of counsel claims except the claims based on trial counsel's examination of Dr. Auble and on trial counsel's failure to object to the use of a stun belt during the trial. We reverse the judgment of the Court of Criminal Appeals granting post-conviction relief on Mr. Mobley's claim of ineffective assistance of counsel resulting from trial counsel's failure to elicit an opinion from Dr. Auble that Mr. Mobley lacked the capacity to premeditate, and we affirm the judgment of the post-

conviction court denying relief as to that claim. We also reverse the judgments of the post-conviction court and the Court of Criminal Appeals denying post-conviction relief with regard to the claim that trial counsel failed to object to the use of a stun belt during the trial, and we remand that issue to the post-conviction court for a new hearing. Because Mr. Mobley appears to be indigent, the costs of this appeal are assessed against the State of Tennessee.

_____
WILLIAM C. KOCH, JR., JUSTICE