Argued and submitted May 23, affirmed December 14, 2005, petition for review denied April 25, 2006 (340 Or 483)

# STATE OF OREGON,
*Respondent,*

*v.*

# PHILLIP BATES,
*Appellant.*

## 02C43419; A121757

125 P3d 42

Jamesa J. Drake, Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Denis M. Vannier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Chief Judge,* and Armstrong, Judge.

ARMSTRONG, J.

---

* Brewer, C. J., *vice* Ceniceros, S. J.

## ARMSTRONG, J.

Defendant appeals a judgment of conviction for supplying contraband. ORS 162.185.[1] His sole assignment of error asserts that, by requiring him to wear a "stun belt," the trial court violated his constitutional right to be free from physical restraints during his trial. We affirm.

The incident from which the charge of supplying contraband arose occurred while defendant was serving two life sentences at the Oregon State Penitentiary. Concerned about courtroom security, the trial court gave defendant the option of wearing either shackles or a stun belt while in the court room. Defendant refused to make a choice between the two restraints, and the court required defendant to wear a stun belt. The record does not reflect the nature or characteristics of the stun belt that defendant was required to wear, but the Ninth Circuit has described one such similar device this way:

> "A stun belt is an electronic device that is secured around a prisoner's waist. Powered by nine-volt batteries, the belt is connected to prongs attached to the wearer's left kidney region. When activated remotely, the belt delivers a 50,000-volt, three to four milliampere shock lasting eight seconds. * * * Upon activation of the belt, an electrical current enters the body near the wearer's kidneys and travels along blood channels and nerve pathways. The shock administered from the activated belt causes incapacitation in the first few seconds and severe pain during the entire period. * * * Activation may also cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. * * * Activation of a stun belt can cause muscular weakness for approximately 30-45 minutes and heartbeat irregularities or seizures. * * * Accidental activations are not unknown."

*Gonzales v. Pliler*, 341 F3d 897, 899 (9th Cir 2003) (internal quotation marks omitted).[2]

---

[1] Defendant was also charged with possession of a weapon by an inmate. ORS 166.275. The jury deadlocked on that charge, and the court ultimately dismissed it on the prosecution's motion.

[2] Another court cites a magazine article that describes promotional literature for stun belts as highlighting the stun belt's "capacity to humiliate" as one of its "great advantages," and asking the rhetorical question,

■ Before trial, defendant expressed concern about wearing the stun belt. The following colloquy ensued:

"[DEFENSE COUNSEL:] [Defendant] tells me that he would like me to object to [the stun belt]. He feels that he is not only potentially uncomfortable wearing that; it would affect his ability to concentrate and follow what's happening in the trial and participate in his defense and to select a jury. * * *.

"THE COURT: Mr. Bates, even though you're in custody and the jurors are going to know you're at the penitentiary because of the nature of the charges, it still is prejudicial if you have shackles on. But because you are currently serving a life sentence—two life sentences—over your head, they cannot just leave you unrestrained. So, it's more prejudicial, I think, for you to have shackles on. The stun belt is an option. I told the police officers to tell you to make your choice. They said you refused to make a choice. So without making a choice, you have a stun belt. You're dressed in civilian clothes. And I think from the jury's prejudice standpoint—I think that's the best place for you to be.

"Did you want to say something?

"DEFENDANT: Yes, your honor. I don't believe that this is necessary. Even though I have a life sentence, I've never acted out in court. I've always been respectful to the judges when—whom I have dealt with. And there's really no evidence to say that—

"I don't know what they're imagining here.

"THE COURT: Let me just tell you, Mr. Bates, the courts in Oregon have had other defendants with very serious charges who have been in custody at OSP who have been totally respectful in court and then ran and grabbed people as hostages and things like that, and so they don't run that risk, and they're not required to. So I appreciate what you're saying. You're absolutely right. You've been appropriate in court. But the reason they have those rules

"After all, if you were wearing a contraption around your waist that by the mere push of a button in someone else's hand could make you defecate or urinate yourself, * * * what would that do to you from the psychological standpoint?"

*People v. Mar*, 28 Cal 4th 1201, 1227 n 8, 52 P3d 95, 111 n 8 (2002) (internal quotation marks omitted).

is they've been sued when those people have escaped, even though they've been totally respectful in court, and they've hurt people. I don't think you're going to escape. I think you're going to be respectful. But they're required to be here and do that. So go ahead and have a seat."

On appeal, defendant argues that the trial court violated his constitutional right to be tried free of restraint absent evidence that he poses an immediate and serious risk of dangerous or disruptive behavior. We review a trial court's decision to restrain a defendant for the purpose of maintaining courtroom security for abuse of discretion. *State v. Kessler*, 57 Or App 469, 472-73, 645 P2d 1070 (1982); *State v. Moore*, 45 Or App 837, 839-40, 609 P2d 866 (1980).

This is a case of first impression. With regard to visible restraints, we have held that it is an abuse of discretion for a trial court to order a defendant to be shackled absent a finding that the defendant poses an immediate or serious risk of dangerous or disruptive behavior. *E.g., State v. Schroeder*, 62 Or App 331, 337-38, 661 P2d 111, *rev den*, 295 Or 161 (1983). However, we have never addressed the propriety of ordering a defendant to wear a nonvisible restraint such as a stun belt. Because we ultimately conclude that, even if the trial court did err in ordering defendant to wear a stun belt, the error was harmless, and because the record is not adequately developed to inform us about the nature of the stun belt that defendant wore, we need not resolve the initial question whether a court must find that the defendant poses an immediate and serious risk of dangerous or disruptive behavior before ordering him to wear a stun belt, as it would before it ordered him to wear shackles.[3]

---

[3] We note that there are a variety of potential resolutions to that question. The Indiana Supreme Court has announced an outright ban on the use of stun belts in Indiana courts. *See Wrinkles v. State*, 749 NE2d 1179, 1194 (Ind 2001), *cert den*, 535 US 1019 (2002) (prohibiting, prospectively, the use of stun belts because, among other reasons, "[a] pain infliction device that has the potential to compromise an individual's ability to participate in his or her own defense does not belong in a court of law" (quoting *Hawkins v. Comparet-Cassani*, 33 F Supp 2d 1244, 1262 (CD Cal 1999))); *see also People v. Martinez*, 347 Ill App 3d 1001, 1006, 808 NE2d 1089, 1093, *appeal den*, 211 Ill 2d 601, 823 NE2d 974 (2004) (McDade, J., concurring) (arguing "that fundamental principles of due process require a general ban on the use of stun belts in Illinois courts" because, among other reasons, "a restraint that, when activated, incapacitates the wearer for up to 45 minutes and causes immediate and uncontrollable defecation and urination" is more offensive to constitutional rights than are shackles).

■ The right to be free from physical restraint during a criminal trial has common-law and constitutional underpinnings. *State ex rel Juv. Dept. v. Millican*, 138 Or App 142, 145-46, 906 P2d 857 (1995), *rev den*, 323 Or 114 (1996). Specifically, physically restraining a defendant implicates Article I, section 11, of the Oregon Constitution and the Due Process Clause of the Fourteenth Amendment to the federal constitution. *State v. Merrell*, 170 Or App 400, 403, 12 P3d 556 (2000), *rev den*, 331 Or 674 (2001). Thus, in order to conclude that any error that the trial court committed by requiring defendant to wear a stun belt was harmless, we must

---

One California appellate court held that, because stun belts were not visible and did not restrain physical movement, their use did not trigger the same test as the use of shackles. Instead, that court held that a court must simply have "good cause" to require a defendant to wear a stun belt. *People v. Garcia*, 56 Cal App 4th 1349, 1356-57, 66 Cal Rptr 2d 350, 354-55 (Cal App 2d Dist 1997), *overruled by People v. Mar*, 28 Cal 4th 1201, 52 P3d 95 (2002). The California Supreme Court later rejected the "good cause" rule, holding that the same procedural requirements applicable to visible restraints such as shackles applied to the use of stun belts. *Mar*, 28 Cal 4th at 1219-20, 52 P3d at 106. Recognizing that "the compelled use of a stun belt as a security measure in a criminal trial, over a defendant's objection, raises significant questions that generally have not been addressed by trial courts asked to approve the use of this relatively novel type of security device," the California Supreme Court held that trial courts, before compelling a defendant to wear a stun belt, should consider the psychological consequences on the defendant, the risk of accidental activation, the medical risks to a particular defendant, and the design of the stun belt. *Id.* at 1228-30, 52 P3d at 112-14.

That a stun belt is not visible to the jury may be a distinction without a difference under Oregon law. In *State ex rel Juv. Dept. v. Millican*, 138 Or App 142, 906 P2d 857 (1995), *rev den*, 323 Or 114 (1996), we explained that the fact that a case was being tried to the court and not to a jury did not make a difference in the applicable analysis. We held that "the right to remain unshackled is based on considerations beyond the potential for jury prejudice, including inhibition of free consultation with counsel." *Id.* at 147.

As noted above, the record in this case is bare as to the facts surrounding the nature of the stun belt used on defendant. Confronted with such a barren record, we are reluctant to prescribe a prospective rule governing the use of stun belts. Other courts have relied on a student-authored law review comment to fill in the blanks in the records before them. See Shelley A. Nieto Dahlberg, Comment, *The REACT Security Belt: Stunning Prisoners and Human Rights Groups into Questioning Whether Its Use Is Permissible Under the United States and Texas Constitutions*, 30 St. Mary's LJ 239 (1998). For example, when the California Supreme Court decided *Mar*, it did so based on a record that did "not contain any facts regarding the physical attributes or function of the stun belt that [the] defendant was required to wear." *Mar*, 28 Cal 4th at 1214, 52 P3d at 103. Nonetheless, the California Supreme Court was comforted by "numerous legal and nonlegal articles [that] provide[d] a detailed discussion of such stun belts." *Id.*, 52 P3d at 103. We would prefer that the arguments for and against the use of stun belts be fleshed out in the trial courts.

apply both the state and federal tests for harmless error. Under Article VII (Amended), section 3, of the Oregon Constitution, an error is harmless if there is little likelihood that it affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Under the federal constitution, the state bears the burden to prove that the error was harmless beyond a reasonable doubt. *State v. Walton*, 311 Or 223, 231, 809 P2d 81 (1991); *see also Deck v. Missouri*, 544 US 622, 125 S Ct 2007, 2015, 161 L Ed 2d 953 (2005) (applying that rule in the shackling context and citing *Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967)). We address the state constitutional question first. *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981).

■     We have identified three potential types of prejudice from shackling:

> "(1) impingement on the presumption of innocence and the dignity of judicial proceedings; (2) inhibition of the accused's decision whether to take the stand as a witness; and (3) inhibition of the accused's consultation with his or her attorney."

*Millican*, 138 Or App at 147-48 (citing *Kessler*, 57 Or App at 474). The first type of prejudice typically results when the jury is aware of the restraints. Here, the parties agree that the jury was unaware of the stun belt. Furthermore, the dignity of the judicial proceedings was not affected by the stun belt because it was never activated. To the extent that one could argue that the mere fact that a defendant is forced to wear a stun belt impinges on the dignity and decorum of a judicial proceeding, such an argument would not be relevant to a harmless error analysis because that sort of effect on the dignity of the judicial proceeding would not have influenced the jury's verdict if the jury were unaware of the belt. Thus, we conclude that there is little likelihood that the stun belt affected the verdict by impinging on the presumption of innocence or the dignity of the proceeding because the jury was unaware of the presence of the stun belt.

The record reflects that defendant took the stand to testify in his defense. Thus, the belt did not inhibit his decision to take the stand. However, it is possible that the presence of the stun belt affected defendant's demeanor on the witness stand.[4]

That very concern persuaded the California Supreme Court in *Mar* that forcing the defendant to wear a stun belt was prejudicial error in that case. There, the "resolution * * * turned completely on the jury's evaluation of the credibility of the witnesses" in a classic swearing match. *Mar*, 28 Cal 4th at 1224, 52 P3d at 110. The defendant "clearly stated that the device made it difficult for him to think clearly and that it added significantly to his anxiety," and the record confirmed "that defendant was nervous while testifying at trial." *Id.*, 52 P3d at 110. Furthermore, the defendant's attorney noted that "defendant was 'afraid that somebody's going to push the button.'" *Id.*, 52 P3d at 110. The California Supreme Court concluded that the error was prejudicial,

> "[g]iven the above cirumstances—the relative closeness of the evidence, the crucial nature of defendant's demeanor while testifying, and the likelihood that the stun belt had at least some effect on defendant's demeanor while testifying[.]"

*Id.* at 1225, 52 P3d at 110.

By contrast, in this case, defendant made no specific complaint about the stun belt's effect on his ability to testify beyond his initial complaint that the belt "would affect his ability to concentrate and follow what's happening in the trial and participate in his defense * * *." Most significantly, he never asserted that the belt affected his testimony. In fact, his demeanor on the stand undermines any argument that the presence of the belt affected his testimony. Rather than appearing anxious on the stand, as the defendant in *Mar* did, defendant appeared, at times, defiant. At one point, in response to a question on cross-examination by the prosecutor, defendant replied, "That's misleading." The court then

---

[4] A similar argument was raised in *Millican*. In response, we stated that "[w]hatever the merits of such a consideration in a different case, it is unsupported on the record here." 138 Or App at 148. Thus, we do not reject the theory outright.

instructed defendant to answer the question. In another instance, defendant hesitated in answering a question and had to be instructed by the court and his counsel to answer it. We recognize, as did the *Mar* court, that it is "impossible to determine with any degree of precision what effect the presence of the stun belt had on the substance of defendant's testimony or on his demeanor on the witness stand," *Mar*, 28 Cal 4th at 1224, 52 P3d at 110; nonetheless, the written record of defendant's testimony is not marked by any obvious sign of anxiety.

Furthermore, unlike *Mar*, this case does not reduce to a true swearing match. Defendant's theory of the case was that the contraband belonged to another inmate. He did not contradict the state's evidence of how or where the contraband was discovered. Thus, credibility did not play the role in this case that it did in *Mar*. That it did not may be reflected in the fact that the jury convicted defendant on the contraband count but failed to reach a verdict in the weapon possession count. Given those circumstances, we conclude that there is little likelihood that the presence of the stun belt had sufficient effect on defendant's ability to testify so as to affect the verdict.

Finally, as the state notes, there is nothing in the record that indicates that the stun belt had any effect on defendant's ability to communicate with his counsel. In fact, the record establishes that defendant communicated frequently with counsel, and was not hesitant to address the court when he disagreed with his counsel's strategy.

Specifically, defendant informed his counsel that he wanted to address the court about the composition of the jury that was selected and, in fact, did so. He also addressed the court about his desire for separate trials on the two counts on which he was charged and asserted that his counsel did not precisely argue the point that he wanted counsel to make. Finally, after the defense had rested, defendant attempted to address the court. The court instructed defendant to speak to his attorney. Defense counsel then informed the court that, against counsel's advice, defendant wanted to testify.

Based on the foregoing, the record reflects that defendant, contrary to his protests at the beginning of his

trial, felt at ease enough wearing the stun belt to interrupt and interact with both his counsel and the court. Significantly, defendant does not identify any particular point at which the stun belt deterred him from consulting with his attorney or participating in his defense. Thus, we conclude that there is little likelihood that the verdict was affected by any inhibition defendant may have experienced as a result of being required to wear the stun belt.

In sum, we conclude that there is little likelihood that the stun belt had any effect on the verdict and that any error in compelling defendant to wear it was not reversible error under the Oregon Constitution. For the same reasons, we conclude that the state has proved that any error was harmless beyond a reasonable doubt under the federal constitution.

Affirmed.