IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2017

**STATE OF TENNESSEE v. COREY JONES**

**Appeal from the Criminal Court for Shelby County**
**No. 14-05813     Lee V. Coffee, Judge**

_____

**No. W2017-00157-CCA-R3-CD**

_____

A Shelby County jury convicted the Defendant, Corey Jones, of aggravated kidnapping, robbery, aggravated burglary, and theft of property valued at $1,000 or more. The trial court imposed an effective nineteen-year sentence. On appeal, the Defendant contends that the trial court erred in requiring that the Defendant wear physical restraints at trial and that the trial court made improper comments in the presence of the jury regarding the credibility of the State's witnesses. Upon reviewing the record and the applicable law, we affirm the judgments of the trial court. We remand for entry of a corrected judgment reflecting a three-year sentence for the theft conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Eric Mogy (on appeal) and Mark Renken (at trial), Memphis, Tennessee, for the appellant, Corey Jones.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The Defendant's convictions arose from a home invasion that occurred on August 14, 2014. Mr. Terry Redden, Mr. Charles Harris, Mr. Bobby McCain, and Mr. Redden's girlfriend, Ms. Shari House, lived in the home. Ms. House was inside the home when the invasion occurred.

At the time of the offenses, Mr. Redden, Mr. Harris, and Mr. McCain were members of the football team at University of Memphis. The Defendant had been a member of the football team but was no longer on the team when the offenses occurred. At one point, Mr. Redden, Mr. Harris, Mr. McCain, and the Defendant were on the team's Leadership Council, which made various decisions on the team's behalf, including those related to player conduct. On one occasion, the Leadership Council reviewed issues involving the Defendant, and Mr. Redden, Mr. McCain, and Mr. Harris each supported the Defendant. Nevertheless, the Defendant was removed from the team for a period and then was allowed to return to the team.

Mr. Redden testified that he was unaware of any animosity between him and the Defendant. Both Mr. Harris and Mr. McCain recalled a prior dispute between Mr. Redden and the Defendant over another woman. However, both Mr. Harris and Mr. McCain testified that the incident occurred long before August 2014, and neither noticed any other issues between the Defendant and Mr. Redden.

On the morning of August 14, 2014, Mr. Redden, Mr. Harris, and Mr. McCain left their home to attend football practice. Mr. Redden locked his bedroom door where Ms. House, who had recently learned that she was pregnant, was asleep. Ms. House awoke to knocking on the door. She believed that Mr. Redden may have forgotten something and opened the door. She saw a man standing in the door way, wearing sheer pantyhose to cover his face, and pointing a gun at her. Ms. House did not recognize the man and described him as African-American and approximately 6'3" or 6'4" tall with broad shoulders and an athletic build. She could see the man's facial features through the pantyhose and later identified the Defendant as the perpetrator in a photographic lineup and at trial.

Ms. House, initially, believed that the Defendant was joking and told him to "stop playing." However, the Defendant entered her bedroom, instructed her to turn around and lie down on the bed, and put the gun to her neck. Ms. House testified that the gun appeared to be real and that she was afraid and believed she was going to be shot. The Defendant took Ms. House's cellular phone and demanded the PIN number. After Ms. House gave him the wrong number, the Defendant shoved the gun further into the back of her neck and again demanded the PIN number. Ms. House provided the Defendant with the correct PIN number.

The Defendant repeatedly asked Ms. House, "Where's the s**t?" Ms. House was crying and told the Defendant, "I don't know. I don't know what you're talking about." The Defendant searched through drawers while Ms. House was lying on the bed. Ms. House said she remained on the bed for approximately ten minutes.

The Defendant instructed Ms. House to get out of the bed, grabbed her by the back of the neck, and told her to not look at him. He walked Ms. House down the hallway with a gun touching the back of her head for approximately twenty feet until they reached the bathroom. He ordered Ms. House to get into the bathtub and to not move or look at him. He turned on the water in the bathroom sink, and Ms. House heard him turn on the water in the kitchen. Ms. House heard the Defendant rummaging through drawers and opening and closing doors.

Ms. House testified that she remained in the bathtub for approximately thirty minutes and that the Defendant returned to check on her twice. The Defendant did not lock her inside the bathroom. She explained that she did not attempt to flee because the Defendant threatened her and told her not to move and she was afraid of being shot.

When the Defendant returned to the bathroom the second time, he asked Ms. House whether a red Chevrolet Trailblazer that was parked outside belonged to her, and Ms. House affirmed that she owned the truck. The Defendant left, and Ms. House heard a vehicle back into the driveway and a door close a few times. After Ms. House did not hear any other noises for a period of time, she ran to a neighbor's house where she called 9-1-1. Ms. House reported that the Defendant took her truck, which was worth more than $1,000, and her cellular phone. Ms. House's truck was returned to her approximately one week later, but her cellular phone was never returned.

Officers contacted Mr. Redden, Mr. Harris, and Mr. McCain, and they returned to the home. They discovered that the side entry door was damaged, that drawers were open, and that clothes were strewn throughout the house. Mr. Redden reported that approximately thirty pairs of shoes, a forty-two-inch television, four watches, and clothing were taken. Four or five pairs of shoes and two watches were later returned to him. Mr. Redden estimated that the value of the items that were not returned was approximately $2,000 to $3,000. Mr. Harris reported missing two watches, a television, a bottle of cologne, and a bottle of aftershave. He later received the watches and the aftershave and estimated that his television was valued at approximately $700 and that his cologne was valued at approximately $110. Mr. McCain reported missing a fifty-five inch television valued at approximately $600 to $800, a MacBook Air laptop valued at approximately $150, eight to ten pairs of shoes valued at approximately $150 to $200 for each pair, three watches, and hats. His three watches and his hats were later returned to him.

- 3 -

Detective Joseph Cunningham of the Memphis Police Department was the first officer to arrive at the scene. He was met by Ms. House, who was "hysterical." Ms. House informed Detective Cunningham that her Chevrolet Trailblazer had been taken. Approximately five minutes after Detective Cunningham arrived, a neighbor stopped him and reported seeing a Chevrolet Trailblazer backed up to a Mazda Millenia with someone transferring items from the Trailblazer to the Millenia. Detective Cunningham located Ms. House's truck approximately one-half block from her home. The keys to the truck were on the hood, and property that appeared to be from Ms. House's home was inside the truck.

The truck was towed to the Memphis Police Department's crime scene laboratory where fingerprints matching the Defendant's left index finger and left palm were lifted from the truck. Officers also located a woman's purse and an Xbox with games and some controllers inside the truck.

Memphis Police Officer LaTanya West, the case officer, verified with Ms. House that she knew the Defendant and that the Defendant did not have permission to be in her truck. The Defendant was brought into the police station where he was advised of his rights and questioned after he waived those rights. The Defendant initially denied knowing Ms. House or taking her truck. He stated that he was out of town when the home invasion occurred and identified two people, who he stated accompanied him on his trip. After officers spoke to the two individuals, neither of whom confirmed the Defendant's story, Officer West confronted the Defendant, who "was still abstract and evasive about the whole thing, as if we were wrong, and it couldn't be him." When officers told the Defendant that the description of the car that had been seen with Ms. House's truck was similar to a car owned by the Defendant's brother, the Defendant denied that the car seen with Ms. House's truck was his brother's car or that the Defendant had driven the car.

Officers obtained a search warrant for the Defendant's apartment. While executing the search warrant, officers recovered a Smith and Wesson .380 handgun and a magazine with .380 bullets inside a kitchen cabinet, a Black Ops BB gun inside the living room closet, three Apple iPhones, two Apple iPods, a Fossil watch, a black do-rag, a Samsung forty-inch television, a flat screen television, two pairs of Air Jordan Nike tennis shoes, one pair of Nike tennis shoes, an empty box for a .40 caliber gun behind the couch in the living room, and a box of .40 caliber ammunition in the living room. One of the televisions was found inside a bedroom closet covered by clothing. Officers did not recover a .40 caliber gun inside the apartment.

Sergeant Shawn Hicks of the Memphis Police Department was asked to assist in questioning the Defendant after other officers were unsuccessful in obtaining the

Defendant's cooperation. Sergeant Hicks began questioning the Defendant after he confirmed that the Defendant was advised of his rights and waived those rights. The Defendant was "totally evasive." He continued to claim that he was out of town when the home invasion occurred, that he did not know those who lived on the street where the home was located, and that he was not involved. Sergeant Hicks told the Defendant that he was aware that the Defendant knew the residents and went to school with them and that the Defendant had been to the home previously. The Defendant acknowledged that he may not have been honest with the officers but continued to insist that he was not involved. He did not change his story even after Sergeant Hicks informed him that officers executed a search warrant at his apartment.

Once Sergeant Hicks showed the Defendant photographs of items belonging to the victims that were found inside of the Defendant's apartment, the Defendant admitted that he committed the offenses and provided details that Sergeant Hicks stated matched those details included in reports from the victims. The Defendant told Sergeant Hicks that he had played football with some of the occupants and that he was angry with one of the men about an incident involving a woman. The Defendant stated that he also was angry because one of the men provided him with free marijuana while they were on the same football team but that the man required the Defendant to pay for the marijuana once the Defendant was no longer on the team.

The Defendant gave a formal statement in which he admitted taking shoes, televisions, and watches from the victims' home. He stated that he was armed with a BB gun and was driving a maroon Mazda Millenia and that no one was injured. The Defendant said he waited until everyone left, entered the house through the back door, and began packing items. He attempted to open the bedroom where Ms. House was sleeping, but it was locked. He stated that when Ms. House opened the door, he pulled out the BB gun and instructed her to lie down on the bed. He said that he saw the keys to Ms. House's vehicle and confirmed that the keys belonged to her. The Defendant told the officer that he "escorted" Ms. House to the bathroom and told her to get into the bathtub. He then walked around the house, packing items and loading them into Ms. House's truck. The Defendant drove Ms. House's truck around the corner, placed the items in his younger brother's car, and drove away.

The Defendant stated that he committed the robbery "to get back" at Mr. Redden. The Defendant explained that Mr. Redden had "talked" to the Defendant's girlfriend and then denied it when the Defendant confronted him. The Defendant also stated that Mr. Redden sold marijuana, previously provided it to him for free, and then began requiring him to pay for it. The Defendant believed that most of the items he took were inside his apartment, although he may have lost some of the items. He stated that he attempted to conceal his identity when he saw Ms. House by covering his face with the hood on his

shirt. He apologized and maintained that he did not want to hurt Ms. House. Sergeant Hicks acknowledged that it was possible that the Defendant may not have expected Ms. House to be home.

Sergeant Hicks testified that upon reviewing the information related to the home invasion, he did not see any indication that drugs were at the victims' home. Mr. Redden testified that he did not sell drugs and that he did not have any drugs in the home. He stated that he saw the Defendant following the offenses and that the Defendant apologized to him. When Mr. Redden confronted the Defendant about his statements to the police that Mr. Redden sold drugs, the Defendant denied making the statements. Mr. Redden testified that the Defendant contacted him and offered him $1,200 to not come to court and that as a result the Defendant was "still not trying to own up to what [he] did." When Mr. Harris saw the Defendant following the invasion, the Defendant apologized but did not return any of the items that had not been recovered.

The Defendant testified that on the night prior to the home invasion, he attended a party where he was drinking alcohol and smoking marijuana. He said he was given a pill while at the party, but he did not take it. After he left the party, a police officer stopped him for running a stop sign, and the Defendant ingested the pill because he did not want the officer to find it on his person. The Defendant said that the pill caused his mind to "race" and that he became intoxicated. He explained that he decided to go to the victims' home to purchase marijuana in order to calm him because he was supposed to go to Atlanta the following day. The Defendant arrived at the victims' house at 3:00 a.m. or 4:00 a.m and parked his car away from the house. He stated that he planned to wait until the victims would be awake but that he fell asleep in his car. He awoke around 7:00 a.m. and saw Mr. McCain leaving.

The Defendant testified that he "felt a little rage" because he had learned that Mr. Redden had been involved in a relationship with the Defendant's girlfriend. The Defendant also testified that Mr. Redden previously provided him with marijuana for free but then required the Defendant to pay for it after they "fell out." The Defendant believed he was not going to obtain marijuana from Mr. Redden and said he was "furious" because he wanted to enjoy himself while on his trip. As a result, the Defendant decided to enter the home. He maintained that he was unaware that anyone was in the home at the time.

The Defendant testified that he began searching for marijuana and believed that Mr. Redden had it hidden in his bedroom. The Defendant discovered that Mr. Redden's bedroom door was locked and "bumped" it two times with his arm. The Defendant stated that the door opened as he turned to walk away, that he was "startled," and that he pulled out his BB gun from his back pocket. He explained that he had the BB gun because he

had used it to shoot rodents and raccoons at the party he had attended. The Defendant instructed Ms. House to lie down on the bed. He stated that he asked for the PIN to her cellular phone because he did not want her to call the police. He also stated, "I wouldn't say I took her phone. It was kind of laying there, and I just picked it up."

The Defendant said that he searched the house for marijuana and other drugs and that he located marijuana, which he placed in a bag along with other items from the home. He returned to Mr. Redden's bedroom to search for marijuana but did not want Ms. House to be in the room while he searched. The Defendant stated that he grabbed Ms. House's shoulder and "escorted" her to the bathroom. He maintained that he was intoxicated and did not understand the magnitude of his actions. He instructed Ms. House to get into the bathtub, turned on the water, and continued searching for items inside the house. The Defendant obtained the keys to Ms. House's truck, loaded up various items, drove the truck to the Mazda that he had been driving, and loaded as much as he could fit inside the Mazda. The Defendant apologized for his actions and said he believed "it was the worst decision" that he had ever made.

On cross-examination, the Defendant denied forcing Ms. House into the bathroom but said he "escorted" her. He said that while he instructed her to get into the bathtub, he did not instruct her to remain there. He also said he did not tell officers that he found marijuana inside the house to prevent charges for stealing drugs. He denied selling or otherwise disposing of any of the items that he took from the home.

The Defendant denied any attempts to dissuade Mr. Redden from coming to court and said he was merely attempting to repay Mr. Redden for any items that the Defendant may have taken and were not returned. The Defendant's bond was revoked as a result of his unauthorized contact. He acknowledged that he was prohibited from contacting Ms. House as a condition of his bond but maintained that he was unaware that he was prohibited from contacting Mr. Redden, Mr. McCain, or Mr. Harris. The Defendant denied asking his mother or his girlfriend to attempt to contact Mr. Redden in an effort to dissuade him from coming to court, and the State played the recordings of the Defendant's calls to his mother and his girlfriend from the jail to counter the Defendant's claims.

The Defendant stated that while he was dressed for court in the holding area waiting for the trial one morning, he did not knock on the door of an adjoining courtroom and tell the deputy who opened the door that he was a police officer who needed to be let out of the holding area.

In rebuttal, the State presented the testimony of Deputy Quinton Gibson, who was assigned to Division VIII of the Shelby County Criminal Court, which shared a holding

area with Division VII, the courtroom where the Defendant's trial occurred. Deputy Gibson testified that after hearing a knock on the door of the holding area, he looked through the peephole and saw the Defendant wearing a black suit and holding a notepad. When Deputy Gibson opened the door, the Defendant identified himself as a Memphis police officer and asked to be allowed out of the holding area. The Defendant explained that he was unable to exit through Division VII. When Deputy Gibson asked to see the Defendant's badge and identification, the Defendant replied that he had left them in Division VII. Deputy Gibson closed the door of the holding area with the Defendant inside and went to Division VII to confirm the Defendant's story. Deputy Gibson learned that the Defendant was an inmate who was on trial and alerted the authorities.

The Defendant was charged with especially aggravated kidnapping of Ms. House accomplished with a deadly weapon, aggravated robbery of Ms. House accomplished with a deadly weapon, aggravated burglary, employing a firearm during the commission of a dangerous felony, and theft of property valued at $1,000 or more. The jury convicted the Defendant of aggravated kidnapping as a lesser-included offense of especially aggravated kidnapping, robbery as a lesser-included offense of aggravated robbery, aggravated burglary, and theft of property valued at $1,000 or more. The jury acquitted the Defendant of the firearm charge. The trial court sentenced the Defendant to eleven years for aggravated kidnapping, four years each for robbery and aggravated burglary, and three years for the theft conviction. The trial court ordered that the Defendant serve his sentences for aggravated kidnapping, robbery, and aggravated burglary consecutively to each other but concurrently with his sentence for theft, for an effective sentence of nineteen years.

## ANALYSIS

On appeal, the Defendant contends that the trial court erred in requiring him to wear physical restraints at trial and that the trial court made improper comments in the presence of the jury regarding the credibility of the State's witnesses. As noted by the State, the Defendant failed to object at trial and failed to raise these issues in his motion for new trial. The failure to timely object or raise the issue in a motion for new trial generally results in waiver on appeal. *See* Tenn. R. App. P. 3(e).

Nevertheless, this court may review the issues for plain error. *See* Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). Five factors must be met before this court will conclude that plain error exists:

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted)).

"'To rise to the level of plain error, [a]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding.'" *State v. Walls*, No. M2014-01972-SC-R11-CD, 2017 WL 5185506, __ S.W.3d __ (Tenn. 2017) (quoting *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)) (alterations in original). All five factors must be established before this court will recognize plain error and "'complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established.'" *Martin*, 505 S.W.3d at 504 (quoting *Smith*, 24 S.W.3d at 283). "'When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *Id.* at 505 (quoting *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016)).

## A. Physical Restraints

Prior to the beginning of the second day of trial, the trial court held a bench conference during which the court informed defense counsel and the prosecutor that the Defendant engaged in conduct that was "tantamount to an escape" and that the Defendant would be handcuffed as a result. The trial court stated that the Defendant attempted to leave the holding cell by telling Deputy Gibson, who was in the courtroom in Division VIII, that the Defendant was a police officer who had been interviewing an inmate in the holding cell and that he needed to get out. The trial court stated that as a result, the court had the deputies "handcuff [the Defendant] to a chair."

The trial court then held a jury-out hearing during which the court announced that it was ordering that the Defendant be "placed under escort" because he "ha[d] played the last trick that he will play with this Court." The trial court found that the Defendant "interfered with the administration of justice" and "essentially tried to escape this morning."

The trial court explained on the record why the Defendant "is now being handcuffed" and "will be escorted by [the Direct Response Team] and have thumbcuffs."

The trial court noted that its courtroom, Division VII, shared a common holding cell with Division VIII. The trial court stated that Deputy Talley, who was assigned to its courtroom, informed the court that the Defendant identified himself as a police officer to Deputy Gibson and said he needed to get out of the holding area but that Deputy Gibson did not allow him to do so. The trial court said Deputy Gibson also came to the court's chambers and reported the incident. The trial court summarized Deputy Gibson's statements:

> [The Defendant] knocked on the door leading into Division VIII's Courtroom. Deputy Gibson told me that he answered it. [The Defendant] was dressed out in civilian clothes, which I allowed him to do. His family has brought him suits and clothing to the Court.
>
> [The Defendant] told Deputy Gibson that he was a police officer, holding papers in his hand, and that he needed to get out, and that he could not get through Division VII, so he needed to be out through Division VIII.
>
> Deputy Gibson told me he asked [the Defendant] for his identification, his badge, and [the Defendant] told him, "I don't have it, but I'll be right back."
>
> And but for Deputy Gibson asking for identification, [the Defendant] was going to walk out of Division VIII's Courtroom, and in essence, attempted to escape from Court today.

The trial court found that the Defendant interfered with "the administration of justice in this Courtroom" and "the orderly process of this trial." The trial court ordered that the Defendant was not allowed to interact with his family and that he "will be escorted by [the Direct Response Team]. He'll have stun-cuffs applied to him. He'll be in leg irons because I will not tolerate anybody trying to escape from Court, and that's exactly what he tried to do." The trial court stated that the Defendant would be allowed to continue to dress in civilian clothes for the trial. The trial court ordered that the Defendant be escorted to the courtroom by two members of the Direct Response Team, who would sit behind him during the trial. The trial court stated that the officers would apply stun-cuffs and that "[i]f [the Defendant] does or says anything inappropriate, I'm going to look at those folks and tell them to shock him, and he'll have voltage placed through his body. [The Defendant] has earned that privilege."

"It is a well-settled principle of due process that every defendant in a criminal case be afforded the 'physical indicia of innocence.'" *State v. Hall*, 461 S.W.3d 469, 497 (Tenn. 2015) (citing *Kennedy v. Cardwell*, 487 F.2d 101, 104 (6th Cir. 1973); *Mobley v.*

*State*, 397 S.W.3d 70, 100 (Tenn. 2013)). The use of physical restraints on a defendant during trial is "an affront to the very dignity and decorum of judicial proceedings," and, thus, restraints may only be used as "a last resort." *Illinois v. Allen*, 397 U.S. 337, 344 (1970); *see Hall*, 461 S.W.3d at 497-98. Tennessee courts have condemned the use of shackles during a trial "absent certain safeguards designed to assure that it would not influence the issue of innocence or guilt." *Hall*, 461 S.W.3d at 497 (citing *State v. Smith*, 639 S.W.2d 677, 681 (Tenn. Crim. App. 1982); *Willocks v. State*, 546 S.W.2d 819, 822 (Tenn. Crim. App. 1976)).

We note that the exact type of physical restraints used on the Defendant is unclear from the record. While the trial court ordered that the Defendant be placed in "stun cuffs," the trial court also mentioned the use of handcuffs and leg restraints. Nevertheless, the Tennessee Supreme Court has recognized that the same principles and procedures for determining the use of shackles also apply to the use of stun belts. *Mobley*, 397 S.W.3d at 101.

"[T]here is a legal presumption against the use of in-court restraints." *Id.* (citing *Willocks*, 546 S.W.2d at 821). The State has the burden of demonstrating that the physical restraints are necessary and serve a legitimate interest, "such a preventing escape, protecting those present in the courtroom, or maintaining order during trial." *Id.* (citations omitted). In determining whether to require a defendant to wear physical restraints, the trial court should consider all relevant circumstances, including, but not limited to: "(1) the defendant's circumstances, such as record of past behavior, temperament, and the desperateness of his or her situation; (2) the state of the courtroom and courthouse; (3) the defendant's physical condition; and (4) whether there is a less onerous but adequate means of providing security." *Id.* (citations omitted). The relevant circumstances should be considered "against the backdrop of affording the defendant the physical indicia of innocence, ensuring the defendant's ability to communicate with counsel, protecting the defendant's ability to participate in his or her defense and offer testimony in his or her own behalf, and maintaining a dignified judicial process." *Id.*

The trial court is required to make particularized findings on the issue. *Id.* Moreover, "the better practice is to hold a hearing on the issue so that factual disputes may be resolved and evidence surrounding the decision may be adduced and made part of the record." *Id.* (citing *Willocks*, 546 S.W.2d at 822). The decision of whether to require the use of physical restraints is a matter within the discretion of the trial court. *See id.* "The trial court must employ the least drastic security measure necessary to accomplish the objective." *Id.* at 99; *see Willocks*, 546 S.W.2d at 822 ("[I]t is an abuse of discretion precipitously to employ shackles when less drastic security measure will adequately and reasonably suffice.") If a defendant is physically restrained in front of a jury, the trial

court must instruct the jury that the restraints should not influence the jury's decision. *Mobley*, 397 S.W.3d at 101; *Willocks*, 546 S.W.2d at 822.

The trial court's decision to require the Defendant to wear physical restraints was not the result of a motion by the State. Rather, the decision derived from the trial court's improper ex parte communications with officers outside the presence of defense counsel and the prosecutor. Supreme Court Rule 10, Canon 2.9(A) provides that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter." While Canon 2.9(A) provides for exceptions to this general prohibition, none of the exceptions apply to this case. One exception allows a judge to

> consult with court staff and court officials whose functions are to aid the judge in carrying out the judge's adjudicative responsibilities, or with other judges, provided the judge makes reasonable efforts to avoid receiving factual information that is not part of the record, and does not abrogate the responsibility personally to decide the matter.

Tenn. Sup. Ct. R. 10, RJC 2.9(A)(3). In communicating with the court officers about the Defendant's conduct, the trial court received factual information that was not part of the record and that the State later presented at trial in an effort to convict the Defendant of the charged offenses. Therefore, this exception does not apply. Another exception permits ex parte communications "for scheduling, administrative, or emergency purposes, which does not address substantive matters," if (a) "the judge reasonably believes that no party will gain procedural, substantive, or tactical advantage as a result of the ex parte communication;" and (b) "the judge makes provision promptly to notify all other parties of the substance of the ex parte communication, and gives the party an opportunity to respond." Tenn. Sup. Ct. R. 10, RJC 2.9(A)(1)(a), (b). The trial court's ex parte communication, however, addressed a substantive matter with an officer who later testified for the State as to that matter at trial, and, therefore, this exception does not apply.

Once an officer approached the trial court and indicated that an incident occurred involving the Defendant, the trial court should have either not allowed the officer to continue until defense counsel and the prosecutor were present or instructed the officer to notify the State of the incident to allow the State to file any necessary motions. Nevertheless, once the trial court received the ex parte communication, the trial court promptly notified the parties of the substance of the communication and provided the parties with an opportunity to respond as required by Canon 2.9(B). Rather than object to the trial court's ruling or offer any argument or evidence on the Defendant's behalf

- 12 -

regarding the use of physical restraints, defense counsel simply apologized for the Defendant's behavior.

The Defendant has failed to establish plain error because the record does not clearly establish what occurred in the trial court. *See Smith*, 24 S.W.3d at 282. As we have noted, the record does not establish what, if any, physical restraints were used in addition to the stun cuffs. The record also does not establish what the restraints looked like or whether the restraints were visible to the jury. *See Mobley*, 397 S.W.3d at 102 (recognizing that "the use of visible restrains undermines the physical indicia of innocence and the related fairness of the fact-finding process"). Nor does the record reflect whether the physical restraints interfered with the Defendant's ability to consult with counsel or impacted his mental faculties to such a degree that it affected his ability to testify on his own behalf. *See id.* Rather, the record reflects that the Defendant did not show any obvious signs of anxiety while testifying at trial. *See id.* (citing *State v. Bates*, 125 P.3d 42, 46 (Or. Ct. App. 2005)).

These factors are important because the Tennessee Supreme Court has recognized that "the use of shackles on a defendant is not, in itself, sufficient to establish a due process violation. Rather, the physical indicia of innocence is a qualified right that depends on the circumstances of each case." *Hall*, 461 S.W.3d at 499. Absent such information in the record, we are unable to conclude that the trial court's decision to require physical restraints amounted to plain error.

Furthermore, there is nothing in the record establishing that the use of shackles improperly influenced the jury. *See id.* at 499-500 (concluding that the defendant is not entitled to relief based, in part, on the defendant's failure to present evidence to support his claim that the use of shackles improperly influenced the jury). The only offenses of which the jury convicted the Defendant as charged were the aggravated burglary and theft convictions, neither of which the Defendant challenged during closing arguments. The jury convicted the Defendant of aggravated kidnapping as a lesser-included offense of especially aggravated kidnapping and robbery as a lesser-included offense of aggravated robbery. By doing so, the jury rejected the State's argument that the offenses were accomplished with a deadly weapon or by display of an article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. *Compare* T.C.A. § 39-13-305(a)(1) (especially aggravated kidnapping) *with* T.C.A. § 39-13-304(a)(5) (aggravated kidnapping); *compare* T.C.A. § 39-13-402(a)(1) (aggravated robbery) *with* T.C.A. § 39-13-401(a) (robbery). The jury also acquitted the Defendant of the firearm charge, thereby accepting the Defendant's testimony that he possessed a BB gun during the invasion and his argument that a BB gun did not constitute a firearm under the applicable statute. Thus, the jury's verdict demonstrates that the jury was able to weigh the proof presented by both parties, that it credited some of the Defendant's testimony despite any restraints,

and that it reached a verdict based on the evidence presented, including the Defendant's testimony. The Defendant has failed to establish that "consideration of the error is 'necessary to do substantial justice.'" *See Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641-42). Therefore, the Defendant has failed to establish plain error.

## B. Improper Comments

The Defendant contends that the trial court improperly commented on the evidence at trial and that, as a result, his convictions should be overturned. We conclude that while the trial court's comments were improper, the improper comments do not rise to the level of plain error.

Mr. Redden, a former football player for University of Memphis Tigers, testified that at the time of trial, he was a professional football player in Ontario, Canada, and that during the previous year, he played for the Carolina Panthers of the National Football League ("NFL"). At the conclusion of this testimony at trial, the following exchange occurred in the presence of the jury:

THE COURT: Mr. Redden, I'm going to see if I test my knowledge of the Canadian Football League, Hamilton, is it Tiger Cats?

THE WITNESS: Tiger Cats.

THE COURT: I got it right, okay.
Mr. Redden, I appreciate your being in Court today, also.
You played with the Panthers last year?

THE WITNESS: Yes, sir.

THE COURT: Were you on the roster when they played the Super Bowl?

THE WITNESS: No, I was not.

THE COURT: Not on the roster? Well, did you play the travel team?

THE WITNESS: No.

THE COURT: No? Yes, sir. You've had—I wish you well.

THE WITNESS: Thank you.

THE COURT: I've followed the [Memphis] Tigers for a long time. Very proud of the Tigers. Very proud of what Justin Fuente[1] has done, and hopefully, they have that program back in the direction where it should have been. I'm proud of y'all because y'all turned the program around.

THE WITNESS: Tried to.

THE COURT: You did. You did, and I appreciate what you've done for the City of Memphis. Appreciate your efforts. I want to thank you for being in Court today. I'm going to excuse you from any additional testimony. You can stay and watch the rest of the trial if you want to, or you're free to leave, and you cannot discuss your testimony with anyone.

Mr. McCain, a former football player for University of Memphis Tigers, testified that he played professional football for the Miami Dolphins of the NFL. At the conclusion of this testimony at trial, the following exchange occurred in the presence of the jury:

THE COURT: Mr. McCain, you're telling me I should get the NFL Sunday Network Ticket now; is that correct?

THE WITNESS: Sir?

THE COURT: I should get the NFL Network Ticket, right?

THE WITNESS: Yes, sir.

THE COURT: Yes, sir. A cornerback. You look like a normal size human being.

THE WITNESS: Yes.

THE COURT: What's your 440 time? You must be a really class player.

THE WITNESS: Yeah. I run the 440.

---

[1] Justin Fuente was the head coach of the University of Memphis football team from 2012 to 2015 and has been the head coach at Virginia Tech since 2016. *See* http://www.hokiesports.com/staff/fuente_justin.html (last visited Feb. 13, 2018).

THE COURT:        440.

THE WITNESS:      Yes.

THE COURT:        That is Deion Sanders' type speed.

THE WITNESS:      Well, somewhat.

THE COURT:        Yes, sir.  I want to thank you for being in Court today, Mr. McCain, and you cannot discuss your testimony with anyone.  You're free to stay and watch the rest of the trial if you have time to do so.  I would encourage you to do so or you're free to go home.

When are you planning on going back to Miami?  Are you practicing right now two days?

THE WITNESS:      No. It's—no, sir.

THE COURT:        Not OTAs right now?

THE COURT:        So that's over for a while?

THE WITNESS:      For a couple of weeks.

THE COURT:        A couple of weeks.  You've got a couple of weeks to get home then?

THE WITNESS:      Yes, sir.

THE COURT:        I really appreciate your being present.  And I wish you well in Miami.  Are you—have you beaten out that person for the starting cornerback position yet?

THE WITNESS:      Yes, I have.

THE COURT:        So you're starting?

THE WITNESS:      Yes, sir.

THE COURT:        Got to get the NFL Ticket.

- 16 -

Article VI, section 9 of the Tennessee Constitution provides that "judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." "In all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 406-07 (Tenn. 1989). It has been held previously that when a trial court improperly comments on the evidence, appellate courts "must consider the trial court's comment in the overall context of the case to determine whether the comment was prejudicial." *Mercer v. Vanderbilt University, Inc.*, 134 S.W.3d 121, 134 (Tenn. 2004) (citing *State v. Caughron*, 855 S.W.2d 526, 536-37 (Tenn. 1993)). However, because it is a non-structural constitutional error, it is subject to harmless error review. *See State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008); *see also State v. Alvin Brewer*, No. W2012-02281-CCA-R3-CD, 2014 WL 1669807, at *14 (Tenn. Crim. App. Apr. 24, 2014) (analyzing improper comments as non-structural constitutional error), *abrogated on other grounds by State v. Duncan*, 505 S.W.3d 480 (Tenn. 2016). The test used to determine whether a non-structural constitutional error is harmless is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Rodriguez*, 254 S.W.3d at 371 (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999); *State v. Allen*, 69 S.W.3d 181, 190 (Tenn. 2002)) (internal quotation marks omitted).

In reviewing the plain error factors, we note that the record clearly establishes what occurred in the trial court. *See Smith*, 24 S.W.3d at 282. We also conclude that the trial court's comments were improper and that the trial court breached a clear and unequivocal rule of law in making the comments. *See id.* By expressing its appreciation to Mr. Redden for what he had "done for the City of Memphis" and essentially gushing over Mr. Redden and Mr. McCain, the trial court improperly bolstered the State's witnesses in front of the jury. Nevertheless, the error is harmless beyond a reasonable doubt because the record demonstrates that the trial court's comments did not contribute to the jury's verdict. *See Rodriguez*, 254 S.W.3d at 371. Rather, as we discussed above, the jury's verdict, which included an acquittal and convictions for lesser-included offenses, demonstrates that the jury was able to weigh the proof presented by both parties and reach a verdict based on the evidence presented, including the Defendant's testimony. The Defendant has failed to establish that a substantial right was adversely affected or that "consideration of the error is 'necessary to do substantial justice.'" *See Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 642). Therefore, the Defendant has failed to establish plain error and is not entitled to relief.

## CONCLUSION

- 17 -

Although the trial court stated during the sentencing hearing that it was imposing a three-year sentence for the Defendant's theft conviction, the judgment reflects a four-year sentence. Generally, where there is a conflict between a judgment form and the transcript of the proceedings, the transcript controls. *See State v. Brown*, 479 S.W.3d 200, 213 (Tenn. 2015) (citations omitted). Accordingly, we remand for entry of a corrected judgment reflecting a three-year sentence for the theft conviction. We otherwise affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE